# 2023 UT App 81

## THE UTAH COURT OF APPEALS

IN THE MATTER OF THE A. DEAN HARDING
MARITAL AND FAMILY TRUST.

ROBERT G. HARDING,
Appellee,
*v.*
RICKIE TAYLOR AND ESTATE OF MARGENE HARDING,
Appellants,

ESTATE OF MARGENE HARDING,
Appellant,
*v.*
ROBERT G. HARDING AND JILL H. KENDALL,
Appellees.

Opinion
No. 20200808-CA
Filed August 3, 2023

Fourth District Court, American Fork Department
The Honorable Darold McDade
The Honorable Roger W. Griffin
The Honorable Robert C. Lunnen
No. 153100007

Jared W. Moss,
Attorney for Appellee Robert G. Harding

Russell S. Walker,
Attorney for Appellant Rickie Taylor

D. David Lambert and Leslie W. Slaugh,
Attorneys for Appellant Estate of Margene Harding

Steven H. Bergman,
Attorney for Appellee Jill Kendall

JUDGE RYAN M. HARRIS authored this Opinion, in which JUDGES JOHN D. LUTHY and AMY J. OLIVER concurred.

———————

HARRIS, Judge:

¶1      This case arises from a protracted and multi-faceted dispute among siblings and stepsiblings regarding the use and distribution of the assets in a trust created by Dean Harding. After four years of litigation and a six-day bench trial, the trial court determined that Rickie Taylor, acting as trustee of his deceased stepfather's trust, engaged in numerous acts of self-dealing and other breaches of fiduciary duties resulting in more than $5 million in damages. After trial, the court also determined—sua sponte—that Margene Harding (Taylor's mother and the lifetime beneficiary of the trust) had been vicariously liable for Taylor's actions, and therefore held Margene's estate (the Estate) jointly and severally responsible for the damages Taylor caused. The court then entered judgment against Taylor and the Estate jointly and severally, and in favor of petitioner Robert Harding, in amounts approximating $5 million. Taylor and the Estate now each separately appeal.

¶2      In his appeal, Taylor raises several challenges. First, he takes issue with the court's order denying his motion to amend his answer to add certain additional affirmative defenses. Second, he challenges the court's summary judgment order in which the court determined, as a matter of law, that Taylor made unlawful distributions from the trust. Next, Taylor appeals the court's orders excluding his expert witnesses. Finally, Taylor makes several complaints about the court's judgment against him, including the amount of damages ordered. As discussed below, we reject most of Taylor's complaints, although we find merit in one aspect of his challenge to the court's damages award.

¶3      In its appeal, the Estate also raises several issues for our consideration. First, it challenges the court's sua sponte

determination that it should be jointly and severally liable for the damages caused by Taylor's wrongdoing. Second, the Estate appeals the court's decision regarding the appropriate interest rate to be applied to a debt two of Dean's children owed the trust. Third, it raises several issues with the form of the judgment. Finally, it takes issue with the court's decision not to award it attorney fees. We find merit in many of the issues the Estate raises.

¶4      For the reasons discussed herein, we affirm some of the court's rulings, but detect error in others, and therefore vacate the court's judgment and remand for further proceedings.

## BACKGROUND

### *The Trust and Dean's Death*

¶5      During his lifetime, Dean Harding was a successful businessman who owned and operated a commercial heating, ventilation, and air conditioning company. With his first wife, Dean[1] had three children: Robert G. Harding, Jill H. Kendall, and Jeana Vuksinick. In the mid-1980s, after Dean's first wife had passed away, Dean married Margene Harding. Margene had several children from previous marriages, including Taylor. After Dean married Margene, Taylor became Dean's stepson and the stepsibling of Robert, Jill, and Jeana.

¶6      In 1994, in an effort to manage his assets and plan his estate, Dean created the A. Dean Harding Marital and Family Trust (Trust). The beneficiaries of the Trust were Dean's "surviving spouse"—Margene—and Dean's three children. Under the terms of the Trust, upon Dean's death, and if Dean's "spouse survives"

---

1. Because several of the individuals involved in this case are members of the same family, we often refer to them by their first names, with no disrespect intended by the apparent informality.

him, "all property subject to [the Trust] shall be divided into two parts known as the marital share and the family share." Dean's surviving spouse was to have the use of certain Trust assets during her lifetime, and then after her death the Trust assets were to be distributed to Dean's three children "in equal shares." Margene's own children—including Taylor—were not direct beneficiaries of the Trust.

¶7 Any income earned by any part of the Trust was to be paid to Dean's spouse, and any excess "undistributed" income from the marital share was, upon the spouse's death, to pass to the "spouse's estate." But aside from such income, "all other properties of" the Trust, including all unused principal, were to pass to Dean's three children upon the spouse's death.

¶8 With regard to Trust principal, the Trust documents did not authorize *any* distribution of principal out of the marital share; those documents state that only the surviving spouse was empowered to receive—but not empowered "to appoint"—"any part of" the marital share's property, but that even she was empowered to receive "income only." With regard to the principal assets of the family share, however, the situation was different: to the extent that the Trust's income was not sufficient to meet the surviving spouse's ongoing "support and maintenance" needs, as viewed through the lens of "her accustomed manner of living," the trustee was authorized, in his "discretion," to use the family share's principal to meet those needs. In making the determination about whether to dip into family share principal to meet the spouse's needs, the trustee was to consider any "income or other resources" that the spouse had at her disposal, and was to "be mindful of the fact that [Dean's] primary concern in establishing the [T]rust is [Dean's] spouse's welfare and that the interests of others in the [T]rust are to be subordinate to [Dean's] spouse."

¶9 The Trust also allowed for "the primary residence owned by" Dean at the time of his death to be "allocated to" the marital share. In that event, Dean's surviving spouse would be allowed to "reside personally upon the said premises" during her lifetime but would be responsible for paying property taxes, maintaining "adequate insurance," and "perform[ing] such repairs and maintenance as may be required to maintain the property in the condition it was maintained prior to [Dean's] death."

¶10 Dean's will—created contemporaneously with the Trust—contained a "spendthrift clause" that all parties now agree was incorporated into the Trust. This provision mandated, in relevant part, that no "interest of any beneficiary" in the Trust "be liable . . . for the debts, contracts, liabilities, engagements, obligations or torts of such beneficiary."

¶11 Dean passed away in January 2004. When he created the Trust, Dean had named himself as trustee, and had named an accountant (Accountant) as successor trustee. Upon Dean's death, Accountant became the trustee of the Trust, and he estimated that the Trust contained a total of about $5.8 million in assets. Accountant further allocated some $1.5 million to the family share and about $4.3 million to the marital share. Accountant also allowed Margene to continue to reside in Dean's residence.

¶12 When Dean died, he was the owner of individual retirement accounts (IRAs) that were valued at approximately $1.5 million. These IRAs were among the assets that Accountant allocated to the marital share of the Trust. Shortly after Dean's death, Accountant signed certain forms clarifying that the Trust was the primary beneficiary of the IRAs. No such forms executed *before* Dean's death are part of the record in this case. But even before Dean's death, the account statements from the IRAs clearly referenced the Trust as the primary beneficiary.

*The Settlement Agreement and the Note*

¶13 Soon after Dean's death, various disputes arose involving the Trust's beneficiaries, and in June 2004, due to "growing contention," Accountant resigned as trustee. Margene then appointed her son—Taylor—as the new trustee of the Trust. Later, Margene also gave Taylor power of attorney over her own personal finances, which power Taylor utilized to, among other things, write checks (or otherwise authorize withdrawals) from her personal bank accounts.

¶14 Robert, Jill, and Jeana questioned Taylor's status as successor trustee, and Taylor took issue with an undocumented $1 million loan (the Loan) that two companies controlled by Robert and Jill had taken from the Trust prior to Dean's death. Both sides filed competing petitions in court raising these and other disputes, and eventually agreed to resolve their differences in a settlement agreement (the Settlement Agreement). Among other things, the Settlement Agreement provided that Taylor would be allowed to continue as trustee of the Trust, but he would be required to "provide a full accounting . . . of the Trust assets and affairs at least annually," provide "quarterly trust brokerage statements," and "communicate with" Robert, Jill, and Jeana through their designated liaison—Jeana—"at least twice per month." Ultimately, in the ensuing years, Jeana met with Taylor about four times per year to obtain information about the Trust, and neither Jeana nor her siblings, prior to 2015, ever asked for additional information from Taylor.

¶15 With regard to the Loan, Robert—both personally and on behalf of the companies—and Jill agreed to "execute a promissory note memorializing the undocumented Loan," and agreed to pay "[a]ccrued interest" at a "variable" rate equivalent to "the margin loan rate assessed by S[a]lomon Smith Barney on Brokerage Account No. 298-02528-13 303 . . . as may fluctuate from time to time until paid in full." The promissory note they later signed (the

Note) also stated that interest payments were to be made quarterly, and that if the Note were to be in "default" that "interest shall accrue at one percent (1%) above" the variable rate specified. Interest paid on the Note was to be considered income from the marital share of the Trust and—under the terms of the Trust—paid to Margene or, if undistributed at her death, to the Estate. Robert and Jill signed the Note as personal guarantors, but each did so "only for one-half (1/2) of the remaining balance plus interest, and only to the extent of [their] inheritance."

¶16 The Settlement Agreement also had an attorney fees clause, which provided that if any party to the agreement were "required to retain counsel to enforce any of the provisions of this Agreement," the party "determined to be in substantial default in any subsequent action shall pay the prevailing [party] its costs and reasonable attorney fees." The Note had such a clause too, pursuant to which Robert and Jill "promise[d] to pay all reasonable costs and expenses of collection of any amount due under this Note including reasonable attorney's fees."

*A Decade of Taylor's Trust Administration*

¶17 Following execution of the Settlement Agreement, Taylor served as trustee of the Trust for the next thirteen years (until he was removed by court order in January 2018). During that time, he took numerous actions that were later questioned by one or more of Dean's children.

¶18 Upon assuming the role of trustee, Taylor made little effort to familiarize himself with much of what his duties entailed.[2] An

---

2. This fact, along with the others in this factual recitation, is presented "in a light most favorable to the trial court's findings," as is required of us in an "appeal from a bench trial." *See Huck v. Ken's House LLC*, 2022 UT App 64, n.1, 511 P.3d 1220 (quotation simplified), *cert. denied*, 525 P.3d 1260 (Utah 2022).

attorney hired by the Trust provided Taylor with a document setting forth some of his duties as trustee, but he read only the pages the attorney said were important, and he was later unable to recollect any of the content of the document. Taylor also later stated that he was unaware of what fiduciary duties are. At one point, when asked whether he had read the Trust documents before beginning to authorize distributions of Trust assets, Taylor stated that he "left that . . . to the attorneys and the accountants."

¶19    Throughout his tenure as trustee, Taylor was largely unaware whether the distributions he authorized came from the marital or family share of the Trust. He later testified that he was unaware of any written guidelines indicating when it was appropriate to distribute money from the family share. As noted above, the Trust allowed Taylor to distribute family share principal only when the trust income and Margene's other assets were insufficient to meet Margene's accustomed needs, but Taylor never analyzed Margene's needs to determine whether principal distributions were appropriate. Throughout the thirteen years he served as trustee, Taylor never tracked the distributions of principal. In addition, with regard to some of the distributions Taylor made from the Trust—including several five-figure payments—Taylor was later unable to explain the destination or purpose of the payments.

¶20    Taylor was also unaware of whether the required minimum distributions (RMDs) he made from the IRAs were considered income and therefore payable to Margene, or were considered principal and therefore subject to the Trust's restrictions on distributions of principal. During his time as trustee, Taylor simply paid 100% of the RMDs from the IRAs to Margene, as if they were entirely composed of income. He later learned, however, that pursuant to the provisions of Utah's Uniform Principal and Income Act (UPIA), only a small portion

of the RMDs could properly be classified as income. *See* Utah Code § 22-3-409.[3]

¶21 During his years as trustee, Taylor used his power of attorney over Margene's personal finances to make transfers of money from Margene's accounts (which were largely funded by Trust assets) to accounts controlled by Taylor, and Taylor was unable to explain the reason for many of these transfers. Examples of these transactions include payment for third-row Utah Jazz season tickets in the amount of $74,945; a $123,470.59 payment to a business Taylor owned; purchase of an Arabian horse; a $93,600 payment to Taylor's sister; and $62,700 in "[f]unds directed to Taylor personally." Some of these transfers he characterized as "gifts" from Margene to him or his siblings.

¶22 Taylor also failed to properly maintain vehicles owned by the Trust. A motorhome owned by the Trust was used by Taylor's siblings until, while being used by Taylor's nephew, it was stolen. A truck and "another car," also owned by the Trust, were gifted by Margene to Taylor's sister. And another Trust vehicle was totaled by Taylor's son.

¶23 While Taylor was acting as trustee, Robert's ex-wife served a writ of garnishment on the Trust regarding money Robert allegedly owed her in their divorce case. Robert claims to have first become aware of his ex-wife's actions when a Trust attorney informed him that his ex-wife had served the writ on the Trust. After receiving notice, Robert claims that he hired an expert "to analyze the propriety of the amount of [her] claim" and that he obtained legal counsel to potentially dispute or negotiate the

---

3. In 2020, our legislature amended and renamed this statute, titling it the "Uniform Fiduciary Income and Principal Act." Utah Code § 22-3-101. No party suggests that the recent amendments are relevant to this case. In this opinion, we refer to this statute as the UPIA, the title it had during the events giving rise to this case.

money owed. However, under the threat of the writ of garnishment, Taylor authorized payment from the Trust of some $250,000 to Robert's ex-wife. Moreover, Robert's ex-wife had previously obtained approximately $35,000 from the proceeds of a short sale of Robert's home. Robert took issue with Taylor's authorization of the payment out of the Trust to his ex-wife, believing that the payment resulted in his ex-wife receiving at least $35,000 more than she was entitled to and that it "undercut any negotiation he had with [her] regarding the [total] amount owed." However, Robert's ex-wife did not make any further claims against Robert for the money owed, and Robert later testified that the Trust's "distributions of funds to [his ex-wife] did extinguish his debt to her."

¶24    In the years after the Loan was memorialized in the Note as part of the Settlement Agreement, Robert and Jill (and their companies) made only two payments on the $1 million Note. Those payments totaled about $58,000 and appeared to include interest calculated at a 2% rate. But no other payments were made, and the two companies involved eventually went out of business. No party gave the Trust any notice of the companies' dissolution, so the Trust, perhaps understandably, never made a claim on any of the companies' assets. A Trust attorney did send a notice of default in 2006. But the Trust never took any other steps to collect on the Note from the companies (prior to dissolution) or from Robert and Jill (as guarantors), and the Note (both principal and interest) remained unpaid until after Margene's death.

*Margene's Death and the Ensuing Distributions*

¶25    Margene passed away in February 2015, and Taylor was appointed personal representative of her estate. The terms of the Settlement Agreement required Taylor to make final distributions of Trust assets within sixty days of Margene's death, but he did not do so within that time period. About six months after Margene's death, Taylor made a partial distribution of $775,000

(before deductions) to each of the three beneficiaries. Robert didn't actually receive any money, though, because Taylor deducted $524,279.25 from both Robert's and Jill's distributions to account for the unpaid principal (but not the unpaid interest) on the Loan, and deducted an additional $250,720.75 from Robert's tally because of the payment made by the Trust, on Robert's behalf, to Robert's ex-wife. Jill received a payment of $250,720.75, and Jeana received the full $775,000. Later, in 2016, Taylor was ordered to transfer nearly all the remaining Trust assets to Dean's three children, and he did so by making a distribution to each of them in the approximate amount of $608,000.

*The Lawsuit and the Two Competing Petitions*

¶26    In September 2015, Robert filed a petition seeking "full distribution" from the Trust, a "full accounting" of Trust expenditures, and "damages resulting from breach of trust." The petition named the Trust, Taylor, the Estate, Jill, Jeana, and Robert's ex-wife as respondents. As to Taylor, Robert alleged that Taylor had unlawfully distributed principal from the Trust, and that at least some of these unlawful distributions had been made "on Margene's behalf." As to his ex-wife, Robert alleged that the payment made to her from the Trust violated the spendthrift provision and "interfered with and frustrated [his] settlement negotiations with" her.[4] And as to the Estate, Robert's only allegation concerned the marital home; he alleged that "Margene failed to repair and maintain the [home] in the condition it was maintained prior to Dean's death." He made no other substantive allegations against the Estate, and did not assert that Margene or the Estate was or should be liable for Taylor's actions.

¶27    In his prayer for relief at the end of his petition, Robert requested a full accounting, and asked that the court order Taylor

---

4. Robert's ex-wife was eventually dismissed from the lawsuit prior to trial, and is not a party to this appeal.

to make distributions to him and his two siblings as required by that accounting. He also asked the court to order Taylor to "take immediate action to recover the funds distributed to" Robert's ex-wife. He requested damages against "the Trust and/or Trustee" resulting from any unlawful distributions Taylor had made from the Trust. Against the Estate, he sought only damages "for the loss in value of" the marital home, as well as "a return of principal wrongfully distributed from the Trust." Although Jill and Jeana were listed as respondents, the petition did not set forth any claims against or requests for relief from them; indeed, as noted, the petition asked the court to order distributions to all three of Dean's children.

¶28   The Estate filed a counter-petition against the Trust, Robert, and Jill. The petition sought an order compelling Robert and Jill to pay the interest owed on the Loan to the Estate, pointing out that interest is classified as income from the marital share of the Trust and is, under the terms of the Trust, payable to the Estate (whose heirs include Taylor) upon Margene's death. The Estate's petition suggested that the total amount of interest owed, at the time the petition was filed, was more than $630,000. With regard to the Trust, the Estate simply asked that "any amounts still owing" to the Estate from the Trust be paid. And in this filing, the Estate included an "objection to" Robert's petition, arguing that Robert's prayer for relief addressing the Estate should be stricken "when no such allegations are made in the petition itself."

¶29   Taylor filed an "objection and response" to Robert's petition, in which he admitted certain of Robert's allegations and denied the rest. He set forth no affirmative defenses of his own, although he did "join[]" in the defenses set forth in the response filed by Robert's ex-wife. In her response, Robert's ex-wife set forth nine separate affirmative defenses, including the allegation that Robert's "claims are barred by the statute of limitations for objecting to and/or opposing the" writ of garnishment, "and by the doctrine of laches."

*Pretrial Motions*

¶30 Following the filing of the two competing petitions and the responses, the litigation entered the discovery phase. The trial court issued scheduling orders setting certain deadlines, and the parties exchanged written discovery, took several depositions, and attempted mediation.

¶31 About nine weeks prior to the end of the fact discovery period, Taylor filed a motion asking for leave to amend his response to add several specific affirmative defenses, including a claim that he "had a good faith basis for his actions" and a claim that Robert's petition was "barred by applicable statutes of limitation, including, but not limited to" Utah Code sections 78B-2-305 and -307. In the memoranda supporting his motion, Taylor never asserted that probate petitions aren't pleadings subject to the usual rules of amendment. Robert opposed Taylor's motion, arguing that Taylor provided no justification for the delay, that waiting to amend was a "dilatory move" made at least in part to "evade [Robert's] discovery requests," and that Robert would be prejudiced because of the little time left in the fact discovery period. After full briefing, the court held a hearing to consider Taylor's motion, and at the conclusion of the arguments denied the motion from the bench. The court's minute entry recites that the motion was denied "[f]or reasons as stated" on the record. But the record submitted to us does not include a transcript of this hearing. After the hearing, the court signed an order memorializing the ruling, therein briefly stating that it had denied Taylor's motion because "adequate justification has not been provided" and because it considered Taylor's delay "unreasonable." Taylor had attempted to justify the amendment, at least in part, by asserting that he had intended his incorporation of Robert's ex-wife's affirmative defenses to include "all applicable statutes of limitations and laches defenses." The court rejected this justification as "faulty," determining that Robert's ex-wife's defense was "limited in scope to one specific issue,"

namely, the writ of garnishment, and that Taylor's incorporation of that defense did not serve to indicate to Robert that Taylor was asserting any different time-based defense.

¶32    Later, Robert moved for partial summary judgment on the narrow question of whether Taylor had violated the "terms of the Trust . . . by invading the principal of the" Trust's marital share, and had thereby breached his fiduciary duties. In particular, Robert asserted that Taylor had made more than $2.2 million worth of "improper distributions" of principal out of the Trust's marital share—some $1 million of which involved distributions from the IRAs, and some $1.2 million of which involved distributions from other sources—all of which were contrary to the Trust documents' command that no such distributions were authorized, and that these actions constituted breach of fiduciary duty. Robert included specific details of the alleged distributions and supported his allegations with bank statements.

¶33    In response, Taylor did not deny making distributions of principal from the marital share, and he in fact admitted to making "over distributions" of principal that "may have been improper," but argued that the distributions were nevertheless "valid" for various reasons. For instance, he argued that the distributions were valid, at least to some extent, because he was authorized to distribute principal from the *family* share at his discretion. And with regard to the IRA distributions, Taylor asserted that he relied on the advice of legal and accounting professionals, and that his actions were therefore reasonable, and he asserted that it was unclear whether the Trust was even the proper owner of the IRAs. Taylor also disputed the amount of the distributions he had made from principal. In reply, Robert pointed out, among other things, that Taylor had not included an "advice-of-counsel" affirmative defense in his responsive pleading, and that the court had already rejected his attempt to add additional affirmative defenses, including specifically a defense that he "had a good faith basis for his actions." Robert

thus asserted that Taylor had waived his opportunity to plead an advice-of-counsel defense.

¶34    After full briefing on the motion, the court held oral argument, and in an oral ruling at the conclusion of the hearing granted Robert's motion, at least in part. The record submitted to us does not include a transcript of this hearing, so the details and scope of the oral ruling are unknown to us. In an order entered about a month later that was intended to memorialize the oral ruling, the court first noted that the Trust authorized Margene to receive "income only" from the marital share, and then concluded that, "[b]ased on . . . Taylor's admissions and the evidence before the court, . . . Taylor made unlawful distributions of principal from the [marital share] to Margene." But that was as far as the court went; it recognized that genuine issues of material fact remained regarding, among other things, the amount and calculation of the unlawful distributions, as well as whether Robert and Jill owed money to the Trust or to the Estate related to the Note. The court reserved all of those issues for trial. And at least in its written ruling, the court made no mention of Taylor's claimed advice-of-counsel defense.

¶35    The court's order also implicitly rejected Taylor's argument that the Trust was not the owner of the IRAs, stating that the marital share of the Trust "included several [IRAs]" and that "[t]he required minimum distributions of the IRAs were paid to" the marital share and transferred to Margene. The court shed additional light on this matter in another order issued the same day resolving a separate motion that Robert had filed; in that other order, the court determined that the Estate "is not the owner or beneficiary of the IRAs." This decision was driven by the court's determination that the Estate had "fail[ed] to provide any admissible evidence to create a genuine issue of fact" with regard to Robert's assertion—amply supported by the record—"that the IRAs were properly transferred to and owned by the . . . Trust after Dean's death."

¶36 Around the same time, Robert also moved for summary judgment regarding the payment Taylor had authorized to Robert's ex-wife. After briefing and argument, the court held that the payment violated the spendthrift provision as a matter of law, but that "[t]here are disputed facts regarding," among other things, "the amount of damages, if any," and concluded that those issues were reserved for trial. The court, however, noted that "equity prevents" giving Robert a "windfall of $250,000," and that factual questions remained regarding whether Robert "suffered any interest losses that he . . . may have been entitled to if . . . the money had been kept longer or there had been a [lower amount that his ex-wife] would've accepted."

¶37 There were also pretrial skirmishes regarding expert witnesses. When the time came for Taylor to designate experts, he designated three: a legal expert and two accounting experts. Robert elected to receive written reports from the accounting experts, but opted to take the deposition of Taylor's proffered legal expert. Taylor did not ever submit expert reports from his two proffered accounting experts. On Robert's motion, and because Taylor failed to submit reports as required, the court later excluded Taylor's accounting experts from testifying in Taylor's case-in-chief, although the court did allow one of them to testify at trial as a rebuttal witness.

¶38 Robert also asked the court to exclude the proffered testimony of Taylor's legal expert, arguing that the court "should not allow a local attorney to tell [it] how to interpret" the Trust documents. The court granted this motion in an oral ruling made at a hearing; it later memorialized that ruling in a brief written order stating simply that, "[a]fter argument by counsel and review of the briefings filed by the parties, the Court grants [Robert's] Motion in Limine excluding all legal expert testimony at trial." The record submitted to us does not contain a transcript of the hearing at which the court rendered its oral ruling, nor does

it contain any additional elucidation of the court's reasoning in granting Robert's motion to exclude Taylor's legal expert.

¶39　While Jill and Jeana each hired counsel and participated in the litigation, neither Jill nor Jeana filed their own petitions or made any claims of their own against Taylor; indeed, as noted, they were included as *respondents* in Robert's initial petition. But as the litigation went on, Jill and Jeana began to align themselves more and more with Robert; in its post-trial findings, the court observed that, by the time of trial, Jill's and Jeana's "interests were eventually aligned with Robert's." About two years into the litigation, and recognizing some uncertainty about whether Jill and Jeana were stating claims, Taylor filed a motion attempting to clarify matters and limit Robert's damages "to his one-third beneficial interest or share of the Trust." Robert, Jill, and Jeana all separately opposed this motion. In his opposition, Robert stated that, even though he was the only one of Dean's children who had filed a petition, he was seeking damages "for the benefit of all beneficiaries—[Robert], Jill and Jeana." After full briefing, the court held argument to consider Taylor's motion, and denied it in an oral ruling at the conclusion of the hearing. The record submitted to us does not include a transcript of this hearing. A few weeks later, the court memorialized its oral ruling in a written order, concluding that Robert "has standing to assert claims on behalf of all of the Trust beneficiaries" and that "[a]ny damages that are ultimately found against Taylor are not limited to [Robert's] one-third beneficial interest."

¶40　As the time for trial grew near, Robert filed a motion to bifurcate, asking the court to separate the trial of the Estate's claims—chiefly, for interest on the Loan—from the trial of Robert's claims for damages relating to improper distributions of Trust principal. In this motion, Robert suggested that the claims stated in his petition against the Estate—regarding the marital home—were "likely resolved" in light of a recent ruling the court

had apparently made regarding the costs to repair the home.[5] Thus, Robert argued, "the only issue remaining" with regard to his petition "is the amount of damages to be awarded against Taylor as the Trustee of the Trust," and therefore in Robert's view the Estate "should not be involved in" the trial of the claims set forth in his petition. The court denied the motion, noting that the case was scheduled to be tried to the bench and stating that "the court is capable of keeping separate the testimony of the various witnesses" regarding the Estate's petition and Robert's petition.

¶41    Also prior to trial, on Robert's motion, the court issued an order removing Taylor as trustee of the Trust. In that same order, the court replaced Taylor with two co-trustees: Robert and Jill.

*The Trial*

¶42    The issues remaining in the case were tried to the bench in March and April 2019. During the course of the trial, the court heard fact testimony from Robert, Jill, Jeana, and Robert's current wife, as well as from Taylor. The court also heard testimony from financial experts, one retained by Robert and one by the Estate, as well as rebuttal testimony from one retained by Taylor. In addition, the court heard testimony from an accountant and an attorney who had provided advice to the Trust during Taylor's tenure as trustee. After the completion of the parties' four-day evidentiary presentation, the court scheduled time for the parties to present extensive closing arguments, which took place over another two days the following week. At one point during closing arguments, Jeana's attorney made an oral motion "to conform the pleadings to the evidence that [Jeana] is a one-third beneficiary of the [T]rust, who essentially has been acting as a Petitioner in this case." Over the Estate's objection, the court ruled that Jeana "is a Petitioner," even though the court was not allowing her to "assert

_____

5. This ruling was later amended to remove all reference to any such costs.

any affirmative claims," and that Jeana had "a third interest, as a beneficiary," in the case. After closing arguments, the court then took the matter under advisement, and asked the parties to submit proposed findings of fact and conclusions of law that were stipulated "on as many points as possible."

*Post-Trial Developments*

¶43   Perhaps predictably, the parties were unable to reach agreement on any matter in the findings and conclusions, and by mid-May they had each submitted individual proposed findings instead. In Robert's set of suggested findings, he did not propose any finding or conclusion that the Estate was (or should be) vicariously liable for Taylor's actions, although Robert did propose that the court "impose[] a constructive trust on the assets of the Estate" and order that "all remaining [Estate] assets payable or distributable to Taylor be used to pay the outstanding judgments in this case." The court reviewed the parties' respective findings and began work on its own written ruling.

¶44   For the next six months, the court held periodic status hearings approximately every sixty days—in July, September, and November—sometimes asking for "clarification" or additional information on issues, and on one occasion stating simply that it had called the hearing to let the parties know that it "need[ed] a little additional time to finish" the ruling and offering its view that "this hearing will technically give [the court] another 60 days." In the November 2019 status hearing, the court indicated that it was nearly finished with its written ruling, and actually announced portions of that ruling during the hearing. In the course of making those announcements, the court declared— sua sponte—that it would be "finding that the [E]state is liable," along with Taylor, for Taylor's actions; the court explained that Taylor "controlled the expenditures of Margene" and "had power of attorney" and "represented both" the Estate and the Trust, and that the Estate "benefited from [Taylor's] misuse of" Trust funds.

The court indicated that it was "struggling a little bit on what the proper law is to divide up the liability between" the Estate and Taylor, and it asked the parties for supplemental briefing on that question and certain other issues.

*The Court's Initial Written Ruling*

¶45    A couple of weeks later, while the supplemental briefing was still in process, the court issued a lengthy written ruling containing both findings of fact and conclusions of law. In that ruling, the court found, among other things, that Taylor did not trouble himself to "read the Trust document prior to making distributions," that he "was ignorant and at times willfully blind of the duties he assumed as a fiduciary under Utah law," "that he did not make reasonable efforts to inform himself of those duties," and that he had, in various ways, breached those duties as trustee of the Trust. In particular, the court determined that Taylor had breached several different fiduciary duties, including his duty to administer the Trust in good faith and as a prudent person would, his duty of loyalty, and his duty to enforce and defend claims against the Trust. The court also found that Taylor had breached a duty to maintain the marital home, explaining that, even though the Trust documents placed that duty on Margene and not on the trustee, "Taylor as trustee can be imputed a duty to maintain the marital home for the welfare of Margene." And the court offered its view that, at least in some respects, Taylor's "testimony lacked any indicia of credibility."

¶46    With regard to Taylor's trust administration, the court found that Taylor's conduct not only "fell short of the required standard" but "crossed over into 'reckless indifference' towards Trust assets, or to acts of bad faith." In the court's view, Taylor "acted as trustee in a dilatory, haphazard, uncaring and slipshod fashion," at times "making use of the Trust as if it were his own personal piggy-bank." The court found that Taylor "showed a blatant lack of care about tracking monies coming out of the

Trust," and that "Taylor frequently invaded Trust corpus principal . . . with no consideration of the limiting terms of the [T]rust agreement." The court found "that Taylor did not make an analysis of his mother's needs when expending trust funds," specifically noting that "Margene had significant assets of her own . . . that [Taylor] should have . . . considered as sources to provide for her care and maintenance prior to expenditure of Trust corpus principal," including two other properties and some $2 million in "Zions stock."

¶47 With regard to Taylor's duty of loyalty, the court found that Taylor had engaged in frequent acts of self-dealing, for himself, his wife, and his siblings, and that he "used his position as trustee to engage in acts of extensive, repeated, and prolonged self-dealing" by "repeatedly authoriz[ing] transactions that directly benefited himself." The court specifically listed the Jazz tickets, the Arabian horse, and direct payments to Taylor's family members as examples of Taylor's self-dealing. The court also mentioned Taylor's "fail[ure] to control [the] vehicles titled in the name of the Trust," stating that it appeared to the court as though Taylor was unaware that the Trust even owned any vehicles. The court found that "Taylor's treatment of the vehicles . . . is typical of his reckless treatment of other Trust assets and his ignorance of his fiduciary duties as Trustee."

¶48 On the question of damages caused by Taylor's mismanagement of the Trust, the court adopted the calculations offered by Robert's damages expert, explaining that her "methods provide a reasonably certain calculation of damages" that "accounts for both excess distributions and losses incurred due to present value of money." Based on the methods used by Robert's expert, the court calculated that the Trust had sustained damages, as the result of Taylor's actions, in the amount of $5,229,095.

¶49 The court also made findings about the marital home, determining that it "was in excellent repair and condition" at the

time of Dean's death, but that Margene did not continue to properly maintain the property afterwards. As noted, however, the court held Taylor responsible for this conduct, imputing Margene's duty onto Taylor. The court determined that the total damages regarding the home were $33,500, and that this amount was "owed to Jeana," because Jeana had purchased the home for full value and then made the repairs to the home herself.[6] The court took the $33,500 amount from estimates provided by Jeana, even though, during a separate legal proceeding, Jeana had claimed she was owed only $29,439 for the repairs.

¶50    The court also determined that Taylor "violated his duty to enforce and defend claims against the Trust" when he authorized the $250,000 payment to Robert's ex-wife. The court found that Taylor "failed to adequately communicate with Robert . . . regarding any merits or defenses to [Robert's ex-wife]'s writ of garnishment . . . , or even to ascertain whether the amounts claimed were proper." The court ruled that Taylor was "liable for the consequences of" this breach, but in its initial post-trial ruling the court made no effort to quantify that amount or identify who the damaged party was. During closing argument and his post-trial proposed findings, Robert had asked the court to award $35,000 plus interest on this issue. Nevertheless, the court later determined, after additional post-trial briefing, that Taylor was liable for the entire payment of $250,720.25.

¶51    In its initial written ruling, the court also made findings regarding the Estate's petition. As noted, the Estate's main issue concerned the unpaid interest on the Loan the Trust had made to

_____

6. The record is somewhat unclear as to the identity of the person(s) or entity from whom Jeana purchased the home—that is, whether she purchased the home from the Trust or bought out her siblings' interest in the home directly after it had been conveyed to them as tenants in common. Ultimately, this issue is immaterial to our analysis.

Robert and Jill and their companies and, specifically, what the appropriate interest rate was. While the Note memorializing the Loan called for an interest rate tied to a particular brokerage account at Salomon Smith Barney, there were several lengthy "gap period[s]," ranging from several months to several years, during which "an interest rate was not published on the account." The Estate's expert used the published rate for the months it was available, but for the gap periods he employed two different methods (more fully explained below, in Part II.B) to estimate what the brokerage account interest rate would have been. Using these methods, the expert calculated the unpaid interest on the Note as $922,219.77.

¶52 The court, despite finding that the Estate's expert's averaging "method to cover short gap periods [was] reasonable," declined to apply the expert's interest rates for any of the gap periods. Instead, the court chose to apply a statutory default interest rate—one that turned out to be much lower than the rates suggested by the expert—to all the gap periods. *See* Utah Code § 70A-3-112 ("If an instrument provides for interest, but the amount of interest payable cannot be ascertained from the description, interest is payable at the judgment rate in effect at the place of payment of the instrument and at the time interest first accrues."). In its initial post-trial ruling, the court asked the parties to provide supplemental calculations of the amount of interest owing, using the methods laid out in the ruling. After supplemental briefing, the court later determined that the total amount of unpaid interest owing on the Note was $565,314.97.

¶53 Finally, the court briefly considered the question of attorney fees, which had been requested by the Estate, Robert, and Taylor. The court determined that Taylor was "not entitled to any attorneys' fees he incurred," but that Robert was entitled to both (a) reimbursement of $187,595.71 from the Trust for fees incurred in defending the administration of the Trust, and (b) additional attorney fees from Taylor, pursuant to Utah's bad faith statute, as

the "prevailing party" in the litigation. *See id.* § 78B-5-825. The court specifically found that "Taylor's defenses against the claims raised" in Robert's petition "were brought in bad faith," and asked Robert to submit an affidavit of fees and costs.

*Joint and Several Liability of the Estate*

¶54 After receiving the court's lengthy written ruling, the parties continued working on their supplemental briefing, not only about the interest calculation but also about the joint-and-several-liability issue raised by the court, sua sponte, in the November 2019 hearing. After full briefing, the court heard argument on that issue, and at the conclusion of the hearing took the matter under advisement. A few weeks later, the court issued a written ruling, making two significant determinations. First, the court determined that the issue of Margene's (and therefore, by extension, the Estate's) vicarious liability for Taylor's actions— despite not having been raised in the pleadings—had been tried by the consent of the parties. Second, the court officially found the Estate jointly and severally liable for Taylor's actions. It specifically did not employ a constructive trust theory to render the Estate's assets available for collection; instead, it noted that "Taylor had power of attorney over his mother's financial affairs while exercising authority and powers as the trustee of" the Trust, and concluded that Taylor had the "intent to unlawfully pilfer the . . . Trust and preserve his mother's estate for his own benefit and the benefit of his siblings." The court offered its view that it "need not retreat to any equitable theory"—such as constructive trust— where there was "an express contract covering the subject matter of the litigation," which contract was, in the court's view, the Trust document. The court later clarified that it had not rejected Robert's constructive trust theory, stating that the fact that it "didn't rule on that theory . . . doesn't mean that [the court] didn't accept it," and explaining that it had simply made a ruling "on an alternative ground." Indeed, the court went so far as to say that, if a constructive trust theory was "what the parties believe is a

more proper finding," the court may be willing to "find that I'm ordering a constructive trust."

*Attorney Fees*

¶55    After the trial, the court also made additional rulings regarding attorney fees. The court had already determined, in its lengthy written ruling, that Robert was entitled to recover reasonable attorney fees from Taylor. Later, Robert submitted an affidavit claiming $441,546.50 of attorney fees and $137,148.38 in costs, which the court determined were reasonable.

¶56    The Estate also requested attorney fees from Robert on the Loan/Note issue, invoking the Note's attorney fees provision and asserting that it had been the prevailing party on the question of unpaid interest on the Loan. The Estate submitted detailed declarations—from two different attorneys—setting forth the fees incurred in that endeavor. In the motion accompanying the declarations, the Estate was careful to point out that "the fee declarations allocate between time spent on issues pertaining to the claim for interest on the Note and time spent on other matters," directing the court's attention to line items in the declarations that had been excluded from the request. The Estate asserted that the items remaining in its request were either directly related to its claim for unpaid interest or, alternatively, were inextricably intertwined with that claim such that they could not meaningfully be separated.

¶57    However, the court denied the Estate's fee request in its entirety, concluding that the Estate had "fail[ed] to properly allocate claimed fees for claims upon which it prevailed." The court acknowledged that the Estate had "made some effort to adhere to the Court's admonition" to properly allocate attorney fees, but ultimately concluded that the Estate's attempts in that regard were inadequate because, in the court's view, the Estate's fee request included fees for "legal work that sought to advance

theories and arguments which the Court did not adopt and upon which the [E]state did not prevail."[7]

*The Form of the Judgment*

¶58   During this same post-trial time period, the court also addressed questions regarding the form of the judgment, including who should be ordered to pay whom and how much. Robert submitted a proposed form of judgment, listing himself as the only judgment creditor, and indicating that Taylor owed him some $5.8 million and that the Estate, through joint and several liability and after an offset for unpaid interest, owed him some $5.2 million. This proposed judgment drew initial objections from the Estate and Taylor. In response to these initial objections, the court clarified that Taylor was solely liable for the payment to Robert's ex-wife, but that the Estate was jointly and severally liable for the marital home damages and fee payments. And it ruled that Robert and Jill were each liable for "one half of the unpaid interest," but it did not add Jill as a judgment debtor, reasoning that "[t]he amount of interest is to mitigate damages owed by the Estate" and should be accounted for as "an offset against amounts owed."

¶59   Just days after the court's ruling on the initial objections to the form of the judgment, the Estate lodged another objection, pointing out that—even though the court had previously held that Robert was not limited to pursuing damages only for his one-third share, had noted that Robert has standing to bring a claim on behalf of his siblings, and had even stated in its written ruling that the damages to the marital home were "owed to Jeana"—the only judgment creditor listed in the judgment was "Robert G. Harding," apparently in his personal capacity. The Estate argued

7. Jill and Jeana also requested an award of attorney fees, but the court denied those claims for various reasons. The propriety of those rulings is not at issue in this appeal.

that the proper judgment creditors should be Robert and Jill "as trustees" of the Trust, because the claims presented at trial were largely "related to claims by the Trust, not claims by Robert G. Harding personally." Robert opposed this objection, asserting that the language of the proposed judgment "is consistent with the procedural history" of the case and with the court's written rulings. The court made no express ruling on this final objection and instead went ahead and signed its judgment without further comment, thus implicitly overruling the objection.

¶60 The signed judgment lists "Robert G. Harding" as the only judgment creditor, and Taylor and the Estate as the only judgment debtors. The document recites that Robert is "awarded Judgment against" Taylor in the amount of $5,815,599.71, and that Robert is "awarded Judgment against" the Estate in the amount of $4,999,564.49.[8] The difference between the two figures—the amount owed by Taylor as compared to the amount owed by the Estate—is $816,035.22, which is the sum of the offset for the unpaid interest on the Note ($565,314.97) and the amount paid to Robert's ex-wife ($250,720.25).

¶61 Following entry of the judgment, the Estate filed a motion to amend the court's rulings, findings, and judgment. In this motion, the Estate argued, among other things,[9] that the court had

_____

8. The judgment also recites that the court "will award attorneys' fees to" Robert, but it makes no effort to quantify those fees. As noted, the court did later quantify those fees in a ruling issued about four months after it signed the judgment, awarding Robert $441,546.50 in fees and $137,148.38 in costs. But the record submitted to us does not include any amended or supplemental judgment including those fees.

9. In addition to the issue it raised regarding the form of the judgment, the Estate also raised objections relating to the court's ruling that it was jointly and severally liable for Taylor's actions.

erred by accounting for the Estate's recovery against Robert and Jill for unpaid interest through a setoff mechanism, instead of entering a separate judgment in favor of the Estate and against Robert and Jill. The Estate pointed out that this was especially problematic with regard to Jill, who was not a judgment creditor and therefore had no positive judgment against which her interest obligation could be set off. After full briefing and argument, the court denied the Estate's motion.

ISSUES AND STANDARDS OF REVIEW

¶62    Taylor and the Estate each separately appeal. In his appeal, Taylor raises four issues for our review. First, he contends that the court erred in denying his motion to amend to add additional affirmative defenses. When reviewing a trial court's decision on a motion to amend, "we give considerable deference to the [trial] court, as it is best positioned to evaluate the motion to amend in the context of the scope and duration of the lawsuit" and we "defer to the trial court's determination." *Daniels v. Gamma West Brachytherapy, LLC*, 2009 UT 66, ¶ 60, 221 P.3d 256 (quotation simplified). Thus, "[w]e overturn a trial court's denial of a motion to amend . . . only when we find an abuse of discretion." *Kelly v. Hard Money Funding, Inc.*, 2004 UT App 44, ¶ 14, 87 P.3d 734.

¶63    Second, Taylor argues that the court erred in determining, on summary judgment, that he had breached his fiduciary duties by making distributions from marital share principal. Summary judgment is appropriate "if the moving party shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Utah R. Civ. P. 56(a). "We review the summary judgment decision de novo." *Salo v. Tyler*, 2018 UT 7, ¶ 19, 417 P.3d 581 (quotation simplified).

¶64    Third, Taylor takes issue with the court's exclusion of his three disclosed expert witnesses. There are "[t]wo different

standards of review [that] apply to claims regarding the admissibility of evidence." *Smith v. Volkswagen SouthTowne, Inc.*, 2022 UT 29, ¶ 41, 513 P.3d 729. "The first standard of review, correctness, applies to the legal questions underlying the admissibility of evidence." *Id.* (quotation simplified). "The second standard of review, abuse of discretion, applies to the [trial] court's decision to admit or exclude evidence and to determinations regarding the admissibility of expert testimony." *Id.* (quotation simplified).

¶65 Fourth, Taylor challenges the court's ultimate determination of damages. "A trial court's findings of fact will not be set aside unless clearly erroneous." *Traco Steel Erectors, Inc. v. Comtrol, Inc.*, 2009 UT 81, ¶ 17, 222 P.3d 1164 (quotation simplified). "The award of damages is a factual determination that we review for clear error." *Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 29, 133 P.3d 428.

¶66 In connection with its appeal, the Estate raises four issues for our consideration. First, the Estate challenges the court's determination to hold it jointly and severally liable for Taylor's actions, and its challenge takes two forms. As an initial matter, the Estate takes issue with the court's conclusion that the vicarious liability issues—which were not present in Robert's pleadings—were tried by the consent of the parties, and that Robert's pleadings could therefore be amended post-trial pursuant to rule 15(b) of the Utah Rules of Civil Procedure. "We review the [trial] court's application of rule 15(b) for correctness. However, because the trial court's determination of whether the issues were tried with all parties' implied consent is highly fact intensive, we grant the trial court a fairly broad measure of discretion in making that determination under a given set of facts." *Hill v. Estate of Allred*, 2009 UT 28, ¶ 44, 216 P.3d 929 (quotation simplified). And more substantively, the Estate challenges the merits of the court's conclusion that it is vicariously liable for Taylor's actions. In some contexts, a vicarious liability ruling involves issues of fact. *See, e.g.*,

*Newman v. White Water Whirlpool*, 2008 UT 79, ¶ 10, 197 P.3d 654 (stating that "[w]hether an employee is in the course and scope of his employment" for purposes of vicarious liability "presents a question of fact for the fact-finder"). In other contexts, though, such a ruling is inherently legal. *See, e.g.*, *Wardley Better Homes & Gardens v. Cannon*, 2002 UT 99, ¶ 19, 61 P.3d 1009 (stating that "[w]hether a principal is vicariously liable for an agent's acts" presents a "legal question[]"). While—as discussed below—the precise legal basis for the trial court's ruling is somewhat unclear, Robert defends the ruling by pointing to principles of agency law. We agree that, under the circumstances, the trial court's vicarious liability ruling was a legal one, not a factual one, and we therefore review it for correctness.

¶67 Second, the Estate argues that the court erred in determining the rate for the unpaid interest due on the Note. Both sides agree that, at least under the circumstances of this case, we should review this issue for correctness. *See USA Power, LLC v. PacifiCorp*, 2016 UT 20, ¶ 32, 372 P.3d 629 (stating that ascertaining "the appropriate interest rate" is "a question of law that we review for correctness").

¶68 Third, the Estate raises several issues with the form of the court's judgment. In particular, it wonders who the proper judgment creditors are, and contends that the court erred in setting off the Estate's award of interest against the amounts the court determined it owed to Robert and Jill for vicarious liability. Challenges to offset determinations often involve mixed questions of fact and law and are "reviewed under a clearly erroneous standard for questions of fact and a correctness standard for questions of law." *Hale v. Big H Constr., Inc.*, 2012 UT App 283, ¶ 11, 288 P.3d 1046 (quotation simplified), *cert. denied*, 298 P.3d 69 (Utah 2013). The issue we address here regarding offset—namely, whether offset was appropriate when one of the parties did not receive a judgment—presents a legal question reviewed for correctness. *See Fisher v. Fisher*, 2009 UT App 305, ¶ 7,

221 P.3d 845 (noting that whether "an offset is allowed under [a] cause of action" is a question "of law, which we review for correctness"), *cert. denied*, 230 P.3d 127 (Utah 2010). And in addition, the Estate challenges the court's award of damages for repairs to the marital home. "The award of damages is a factual determination that we review for clear error." *Saleh*, 2006 UT 20, ¶ 29. However, "[w]e review the court's legal conclusions for correction of error." *Hale*, 2012 UT App 283, ¶ 13.

¶69 Finally, the Estate takes issue with the court's rejection of its claim for attorney fees incurred in furtherance of its successful claim for unpaid interest on the Note. "The award of attorney fees is a matter of law, which we review for correctness. However, a trial court has broad discretion in determining what constitutes a reasonable fee, and we will consider that determination against an abuse-of-discretion standard." *Jensen v. Sawyers*, 2005 UT 81, ¶ 127, 130 P.3d 325 (quotation simplified).

## ANALYSIS

### I. Taylor's Appeal

¶70 As noted, Taylor asks us to consider four issues in connection with his appeal. First, he challenges the court's denial of his motion to amend to add additional affirmative defenses. Second, he takes issue with the trial court's ruling, made on summary judgment, that Taylor had breached his fiduciary duties by making unlawful distributions from the Trust's marital share principal. Third, he challenges the trial court's decision to exclude his expert witnesses. Finally, he raises certain challenges to the court's damages determinations. We address each of Taylor's arguments in turn.

## A. Taylor's Motion to Amend

¶71 First, Taylor asks us to examine the court's ruling denying his motion to amend his responsive pleading to add several additional affirmative defenses, including a more specific statute of limitations defense and a defense that he "had a good faith basis for his actions." The court denied Taylor's request on the basis that Taylor had engaged in "unreasonable delay" and had "failed to provide adequate justification [as to] why he did not [seek to] amend his pleading earlier." We discern no abuse of discretion in the trial court's decision.

¶72 In deciding a motion to amend, courts are instructed to consider several factors, including whether the movant "was aware of the facts underlying the proposed amendment long before its filing, the timeliness of the motion, the justification for the delay, and any resulting prejudice to the responding party." *Jones v. Salt Lake City Corp.*, 2003 UT App 355, ¶ 16, 78 P.3d 988 (quotation simplified) (affirming the denial of a motion to amend where it was filed about a year after the deadline for amending pleadings and where the movant provided no justification for the delay), *cert. denied*, 90 P.3d 1041 (Utah 2004). In this case, the court denied Taylor's motion in an oral ruling from the bench, and the record submitted to us does not include a transcript of that oral ruling. But in a subsequent written order memorializing its ruling, the court focused on two of these factors: timeliness and justification. The court was of the view that Taylor had waited too long to seek amendment of his responsive pleading, despite apparent awareness of the relevant issues, and that his delay was not justified by any good reason. The court rejected as "faulty" Taylor's excuse that he had been under the impression that his original answer—which incorporated by reference the statute of limitations defense pleaded by Robert's ex-wife—included "all statute of limitations" defenses. The court's written ruling made no specific mention of Taylor's desired "good faith" defense.

¶73    In his appellate brief, Taylor does not engage with the trial court's reasoning, and provides no specific response to the court's conclusion that his motion was untimely and his delay was unjustified. Instead, he makes two arguments in support of his appellate challenge. First, he asserts that his unpleaded statute of limitations defense was meritorious. But this is beside the point here; if the trial court was within its discretion to deny Taylor's motion to amend on delay and justification grounds, then the merits of Taylor's unpleaded defenses are not directly relevant.

¶74    Second, Taylor suggests that, because this case was a probate action initiated by a "petition" rather than a "complaint," the rules of civil procedure regarding timeliness of pleadings do not apply. But this argument is unpreserved; Taylor did not make it at the trial court level—at least not in his written filings; as noted, the record includes no transcript of the hearing—and thus did not give the trial court an opportunity to rule on it. *See Gowe v. Intermountain Healthcare, Inc.*, 2015 UT App 105, ¶ 7, 356 P.3d 683 (stating that, "to preserve an argument for appellate review, the appellant must first present the argument to the [trial] court in such a way that the court has an opportunity to rule on it," and observing that "we generally do not address unpreserved arguments raised for the first time on appeal" (quotation simplified)), *cert. denied*, 364 P.3d 48 (Utah 2015). Therefore, we decline to consider this argument for the first time on appeal.

¶75    Under these circumstances—where Taylor does not provide us with a transcript of the trial court's oral ruling, does not directly engage with the court's reasoning, and offers an argument that is apparently unpreserved—Taylor has not carried his burden, on appeal, of demonstrating that the court abused its discretion by denying his motion to amend his responsive pleading to add additional affirmative defenses. We therefore affirm the court's denial of that motion.

B. The Summary Judgment Ruling

¶76   Next, Taylor challenges the trial court's determination, made on summary judgment, that he made unlawful distributions from the Trust's marital share principal and thereby breached his fiduciary duties. In particular, he asserts that this ruling was inappropriate because genuine issues of material fact remained to be decided in connection with these issues. But Taylor has not borne his burden, here on appeal, of demonstrating error in the court's summary judgment ruling.

¶77   As a threshold matter, it is important to recognize that the ruling in question was brief and quite narrow. In that ruling, the court noted that, under the terms of the Trust, Taylor was not allowed to distribute principal from the marital share, and it noted that Taylor had admitted to making distributions of principal from the marital share. The court therefore determined, as a matter of law and under the plain terms of the Trust documents, that these distributions were "unlawful." It reserved all other issues for trial, including "the amount of damages that resulted from" any such unlawful distributions.

¶78   Taylor does not challenge the court's determination that, under the terms of the Trust documents, he was forbidden from distributing principal out of the marital share. And he does not take issue with the court's observation that, in discovery, Taylor admitted that he had indeed made distributions of principal out of, among other sources, the IRAs that Accountant had placed in the marital share. Thus, his challenge to the court's summary judgment ruling is limited: he takes issue only with the court's conclusion that those admitted distributions were *unlawful* as a matter of law. In this regard, Taylor makes three arguments, which we consider in turn.

1

¶79　First, Taylor asserts that his actions were not unlawful—at least not as a matter of law—because he had merely been following advice given to him by professionals (namely accountants and attorneys) retained to advise him in his role as trustee, and that questions of fact therefore remained regarding the reasonableness of his conduct. But on the record before us, this argument cannot carry the day for Taylor.

¶80　Under Utah law, a trustee who violates a duty owed to a beneficiary has breached fiduciary duties. *See* Utah Code § 75-7-1001 ("A violation by a trustee of a duty the trustee owes to a beneficiary is a breach of trust."); *see also id.* § 75-7-801 (stating that trustees must "administer the trust expeditiously and in good faith, in accordance with its terms and purposes"). And it does not matter that the trustee's actions were merely negligent (rather than knowing or intentional). *See* Restatement (Third) of Trusts § 93 cmt. b (Am. L. Inst. 2012) ("A breach of trust occurs if the trustee, intentionally or negligently, fails to do what the fiduciary duties of the particular trusteeship require or does what those duties forbid . . . . [A] trustee may commit a breach of trust by conduct (action or inaction) that results from a mistake . . . , typically [one] regarding the nature or extent of a trustee's duties or powers.").

¶81　In this case, the plain language of the Trust documents clearly forbade Taylor from making any distributions from the principal assets of the Trust's marital share. He therefore had a clear obligation not to authorize distributions of principal from the marital share. He violated that obligation by repeatedly authorizing such distributions, and this is true even if one assumes, for purposes of the argument, that Taylor made the distributions negligently rather than intentionally or knowingly. Unless otherwise excused, that action constitutes a breach of the

fiduciary duties that Taylor, in his capacity as trustee, owed the beneficiaries of the Trust.

¶82    However, under the Restatement's approach, in certain circumstances, a court has the authority, where equity demands it, to excuse a trustee from having to pay a liability resulting from a breach of duty. *See id.* § 95 cmt. d (stating that, where a court concludes that "it would be unfair or unduly harsh to require the trustee to pay . . . the liability that would normally result from a breach of trust, the court has equitable authority to excuse the trustee . . . from having to pay that liability"); *see also* Restatement (Second) of Trusts § 205 cmt. g (Am. L. Inst. 1959) ("In the absence of a statute it would seem that a court of equity may have power to excuse the trustee in whole or in part from liability where he has acted honestly and reasonably and ought fairly to be excused."). For instance, where case law upon which a trustee relied is later overruled, courts might conclude that a trustee should be equitably relieved from the consequences of a breach of duty. *See* Restatement (Third) of Trusts § 95 cmt. d (Am. L. Inst. 2012). And as relevant here, courts may reach a similar conclusion where "a trustee has selected an adviser prudently and in good faith, has provided the adviser with relevant information, and has relied on plausible advice on a matter within the adviser's competence." *See id.* § 93 cmt. c.

¶83    In the trial court, Taylor opposed Robert's summary judgment motion by arguing, among other things, that his actions were reasonable because he relied on professional advice; in so doing, however, Taylor did not cite the Restatement or ask the trial court to apply its approach. Robert replied by asserting that "advice of counsel" was an affirmative defense that Taylor had waived by not pleading it and by failing to obtain leave to add that defense in an amended pleading. We do not know if Taylor's advice-of-counsel defense (or Robert's waiver argument made in response to it) was discussed during the oral argument on Robert's summary judgment motion, because the record

submitted to us does not include a transcript of that hearing. And the court's rather brief written order memorializing its summary judgment ruling makes no mention of the issue.

¶84 There are several plausible ways the trial court could have handled Taylor's advice-of-counsel defense at the summary judgment stage. First, the court could have determined that Utah law does not allow an advice-of-counsel defense under the circumstances presented here. We are unaware of any Utah authority adopting the Restatement's approach, so it is unclear whether that approach is consonant with Utah law; certainly, Taylor makes no effort to so persuade us in his appellate brief.[10] Second, the court may have adopted Robert's argument that Taylor waived this defense by failing to plead it in his answer and by failing to persuade the court to allow amendment of that answer. As already noted, several months before the summary judgment hearing the trial court *did* deny Taylor leave to amend his responsive pleading to add a "good faith" defense, ruling that

---

10. At one point in his appellate brief, Taylor mentions in passing that the trial court "made no finding under Utah Code § 75-7-814(2) regarding whether or not a lay trustee may rely on professional counsel and accounting advice, and whether such reliance demonstrates reasonable care." That statute provides that trustees may delegate "investment and management functions" to a professional as long as the trustee engages in certain oversight, and if trustees do so, they are "not liable to the beneficiaries or to the trust for the decisions or actions of the agent to whom the function was delegated." Utah Code § 75-7-814(2). But Taylor did not invoke this statute in opposing Robert's summary judgment motion, and any argument that the trial court erred by not considering the statute is therefore unpreserved. And in any event, Taylor does not argue that he delegated any specific task or function to any professional pursuant to this statute.

any such amendment was too late and unjustified. On appeal, Taylor does not refute Robert's assertion that he waived the defense, and he makes no effort to show that advice of counsel is not the sort of affirmative defense that must, upon penalty of waiver, be pleaded in an answer.[11] Third, the court may have determined that resolution of Taylor's advice-of-counsel defense was not necessary at the summary judgment stage. In fact, the written summary judgment ruling is not necessarily at odds with that defense: even if the distributions from the marital share are considered unlawful, the court could, during the damages phase of the proceedings, potentially equitably relieve Taylor from the consequences of those unlawful distributions. And here on appeal, Taylor makes no argument that he was prevented, at trial, from presenting evidence relating to his advice-of-counsel defense. Fourth, the court could have determined, at the summary judgment hearing, that the undisputed evidence regarding Taylor's advice-of-counsel defense was insufficient to present a genuine dispute of material fact that would prevent summary judgment. Or fifth, the court could have completely ignored the issue, and simply made no ruling on it at all.

---

11. Whether advice of counsel is the sort of affirmative defense that is considered waived if not pleaded in a responsive pleading is an interesting question. We are aware of Utah law stating that, at least in certain contexts, "reasonable reliance on the advice of counsel is an affirmative defense." *See Hodges v. Gibson Products Co.*, 811 P.2d 151, 159–60 (Utah 1991). But other courts have held that, at least in some circumstances, advice of counsel does not need to be pleaded in an answer. *See, e.g.*, *LG Philips LCD Co. v. Tatung Co.*, 243 F.R.D. 133, 139 (D. Del. 2007). Because the parties have not briefed this issue, and because it is only tangentially related to the question at hand, we offer no opinion on whether advice of counsel is the sort of affirmative defense that is waived if not included in a responsive pleading.

¶85    We do not know what the court did with Taylor's advice-of-counsel argument at the summary judgment phase, because its written ruling is silent on the matter and its oral ruling is not included in the appellate record. It is certainly not obvious, from the record before us, that the trial court erred in the way it handled Taylor's asserted advice-of-counsel defense in connection with Robert's summary judgment motion. It is an appellant's responsibility "to include in the record a transcript of all evidence relevant to a finding or conclusion that is being challenged on appeal." *Gines v. Edwards*, 2017 UT App 47, ¶ 21, 397 P.3d 612 (quotation simplified), *cert. denied*, 398 P.3d 52 (Utah 2017). "When an appellant fails to provide an adequate record on appeal, we presume the regularity of the proceedings below," and "when crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." *State v. Pritchett*, 2003 UT 24, ¶ 13, 69 P.3d 1278 (quotation simplified); *see also Bank of Am. v. Adamson*, 2017 UT 2, ¶ 11, 391 P.3d 196 (stating that an appellant's brief must "contain the contentions and reasons of the appellant with respect to the issues presented . . . with citations to the authorities, statutes, and parts of the record relied on" (quotation simplified)).

¶86    In situations like this one, where "crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court." *Pritchett*, 2003 UT 24, ¶ 13 (quotation simplified). While it is perhaps not always necessary for an appellant challenging an adverse summary judgment ruling to include in the appellate record a transcript of the oral argument on the summary judgment motion, *cf. Gines*, 2017 UT App 47, ¶ 21 (noting that "an appellant is not required to provide the transcript from every proceeding that occurred in the case"), in our view this is necessary in cases where the court issued an oral ruling at the conclusion of the hearing and where the court's eventual written order is silent with regard to the matter being challenged. In such cases, a transcript of the hearing is necessary

for us to effectively review the challenged issue. Without the transcript, we do not know what evidence or argument the court relied on in rendering any decision. Indeed, in this case we do not know if the court even made a decision on the point Taylor challenges. Under these circumstances, Taylor "has not provided this court with the tools necessary to determine whether the [trial] court" erred, and therefore his "claim of error," in this regard, "is merely an unsupported, unilateral allegation which we cannot resolve." *R4 Constructors LLC v. InBalance Yoga Corp.*, 2020 UT App 169, ¶ 12, 480 P.3d 1075 (holding that the appellant did not show an abuse of discretion where he failed to include a necessary transcript in the appellate record). Accordingly, Taylor has not carried his burden of persuasion on appeal, and the trial court's summary judgment ruling is not now assailable on the basis that questions of fact remained to be decided regarding whether Taylor reasonably followed professional advice.

2

¶87     Second, Taylor asserts that the IRAs from which many of the allegedly unlawful distributions of principal were made were not part of the Trust at all, and therefore the distributions could not have been unlawful. But the trial court did not err in determining that no genuine issue of material fact existed on this point. As noted above, the court issued a separate ruling, signed on the same day and arising out of the same summary judgment hearing, determining that Robert had conclusively demonstrated that "the IRAs were properly transferred to and owned by the [Trust] after Dean's death." And in the summary judgment ruling at issue here, signed by the court just minutes later, the court simply noted that the marital share of the Trust "included" the IRAs. Taylor asserts that there existed questions of fact about the ownership of the IRAs, because the parties were never able to locate a "signed beneficiary designation" executed prior to Dean's death. But Robert submitted quite a bit of evidence, including account statements from the IRAs dated prior to Dean's death,

indicating that the IRAs were in fact part of the Trust.[12] And Accountant—the first successor trustee of the Trust—certainly saw it that way. Taylor did not meaningfully rebut this evidence; the mere absence of a signed beneficiary designation is not, under these circumstances, enough to create a genuine issue of material fact regarding ownership of the IRAs.

3

¶88    Finally, Taylor asserts that his distributions of principal from the marital share, including distributions from the IRAs, can be considered lawful if they are offset against distributions of principal he could have hypothetically lawfully made from the family share. As noted above, Taylor had conceptual authority to make distributions of principal from the family share for Margene's "support and maintenance" if the Trust income and Margene's other assets were not sufficient to address her needs. In other words, Taylor asserts that the beneficiaries would not be entitled to any damages resulting from his otherwise unlawful distributions of marital share principal if Taylor can show that those distributions could, in his discretion, have been made from the family share instead. But even if this is true, this argument serves only to reduce the damages sustained by the beneficiaries as the result of Taylor's breaches of duty; this argument does not

---

12. Taylor argues that the court should not have considered much of this evidence because it was attached to Robert's reply brief submitted in support of his summary judgment motion. He argues that Robert's "obligation was to present all claimed relevant facts with his initial motion" and that "[n]ew materials cannot be raised in a reply memorandum." But Robert did not raise any new issue in his reply; he merely responded to Taylor's claims—included in his memorandum opposing Robert's motion—regarding IRA ownership. The court did not err in considering the materials Robert submitted in connection with his reply brief in support of his motion.

somehow transform Taylor's unlawful distributions into lawful ones. As noted, the court reserved for trial, among other things, all questions regarding "[t]he total amount of damages that resulted from Taylor's unlawful distributions of principal from the" marital share. And in addition, there is no evidence that Taylor actually engaged in the analysis required prior to making lawful distributions from the family share principal—assessing whether Margene's reasonable needs could be met from her own assets and the income from the Trust.

¶89　In the end, we perceive no error, on this record, in the trial court's narrow ruling, made on summary judgment, that Taylor had made unlawful distributions of principal from the Trust's marital share, and that he had thereby breached the fiduciary duties he owed to the beneficiaries.

### C. Taylor's Expert Witnesses

¶90　Taylor next challenges the court's orders prohibiting his disclosed expert witnesses from testifying in his case-in-chief at trial. The court excluded two of these experts—Taylor's financial experts—because Taylor failed to serve the required report from the experts.[13] And the court excluded the third expert—Taylor's legal expert—for reasons we cannot, on this record, ascertain. Under the circumstances presented here, Taylor has not persuaded us that the court's orders regarding his expert witnesses are subject to reversal.

¶91　The court had good reason to exclude Taylor's two financial experts. Following Taylor's disclosure of these two experts, Robert opted to require the experts to produce a written report. *See* Utah R. Civ. P. 26(a)(4)(C)(i), (ii) (stating that "the party opposing the expert may serve notice electing either a deposition

---

13. The court did, however, allow one of Taylor's financial experts to offer rebuttal testimony at trial.

of the expert . . . or a written report" from the expert). Taylor failed to timely provide those reports. The court's order excluding those experts on that basis is therefore sound. *See id.* R. 26(d)(4) ("If a party fails to disclose or to supplement timely a disclosure or response to discovery, that party may not use the undisclosed witness, document, or material at any hearing or trial unless the failure is harmless or the party shows good cause for the failure."); *see also Clifford P.D. Redekop Family LLC v. Utah County Real Estate LLC*, 2016 UT App 121, ¶¶ 15–16, 378 P.3d 109 (upholding a trial court's exclusion of an expert witness when the party did not timely provide a written report by the deadline or provide "good cause" for failing to do so). And on appeal, Taylor does not attempt to argue that his failure to provide reports was harmless or spurred by good cause. Instead, Taylor merely informs us of what the witnesses would have testified about and asserts that the witnesses' testimony "would have been of great benefit to the court." This is insufficient to establish that the court abused its discretion. *See R.O.A. Gen., Inc. v. Chung Ji Dai*, 2014 UT App 124, ¶ 11, 327 P.3d 1233 ("We have held that the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that the violation of rule 26 . . . was either justified or harmless." (quotation simplified)), *cert. denied*, 337 P.3d 295 (Utah 2014).

¶92 Taylor's third witness, the legal expert, was dismissed after a hearing. In his motion asking the court to exclude Taylor's legal expert, Robert argued that the court "should not allow a local attorney to tell [it] how to interpret" the Trust documents. The court granted this motion in an oral ruling made at the conclusion of the hearing; the court's minute entry contains very little information about the basis for the ruling. A few weeks after the hearing, the court signed a written order, prepared by counsel, that was intended to memorialize the oral ruling; that order stated simply that, "[a]fter argument by counsel and review of the briefings filed by the parties, the Court grants [Robert's] Motion in Limine excluding all legal expert testimony at trial." And as

noted, the record submitted to us does not contain a transcript of the hearing at which the court rendered its oral ruling, nor does it contain any additional elucidation of the court's reasoning in granting Robert's motion to exclude Taylor's legal expert.

¶93 Under circumstances like these, an appellant fails to carry its burden of persuasion on appeal. As already noted, it is an appellant's responsibility "to include in the record a transcript of all evidence relevant to a finding or conclusion that is being challenged on appeal." *Gines*, 2017 UT App 47, ¶ 21 (quotation simplified) (affirming a trial court's decision on a motion in limine because the appellant did not provide a transcript of the hearing); *see also Pritchett*, 2003 UT 24, ¶ 13 (stating that, in the absence of an adequate record, "we presume the regularity of the proceedings below," and that "when crucial matters are not included in the record, the missing portions are presumed to support the action of the trial court" (quotation simplified)).

¶94 In this non-legal-malpractice case, we can easily envision good reason for the court to have excluded Taylor's proffered legal expert. *See Steffensen v. Smith's Mgmt. Corp.*, 862 P.2d 1342, 1347 (Utah 1993) ("Even though experts can testify as to ultimate issues, their testimony must still assist the trier of fact under rule 702. Opinion testimony is not helpful to the fact finder when it is couched as a legal conclusion." (quotation simplified)). And where, as here, material gaps in the appellate record exist, we must presume the regularity of the proceedings, and presume that the court had good reason to take the action it took. Under these circumstances, Taylor has simply not persuaded us that the court abused its discretion in excluding his legal expert witness.

¶95 Accordingly, we reject Taylor's assertions that the trial court abused its discretion in ordering the exclusion of all three of Taylor's disclosed expert witnesses.

## D. The Court's Damages Award

¶96    Finally, Taylor raises two challenges to the court's damages determinations. He first makes a general challenge to the court's damages award, asserting that the court should not have used the damages calculation offered by Robert's damages expert because that expert "made too many mistakes and relied on assumptions that are too speculative." He next asserts that Robert did not suffer $250,000 in damages from the distribution to Robert's ex-wife because Robert "received full credit against the judgment for the money distributed." We reject Taylor's first challenge, but find merit, at least to some extent, in the second.

¶97    Taylor's general attack on Robert's damages expert—and, by extension, on the court's damages computation—is not well-taken. As examples of the "faulty assumptions" Robert's expert made, Taylor points to the expert's assumptions—held at least prior to trial, if not afterward—that three specific transactions (or sets of transactions) constituted "distributions" of Trust assets: (1) a $200,000 transfer between Trust accounts, (2) several five-figure checks of unknown purpose, and (3) a separate sale of an investment in the Trust portfolio. But as Robert points out, the expert herself—after receiving additional information at trial—backed away from the first assumption, and ended up not including the $200,000 transfer in her ultimate recommendation to the court. And most importantly, it does not appear that the trial court actually included *any* of the identified transactions in its damages award—at least, Robert asserts that it didn't, and Taylor does not take issue with that assertion. So, to the extent that these identified transactions constitute "mistakes" on the part of Robert's expert, the court appears to have accounted for those mistakes in its damages award.

¶98    As noted above, we review the court's damages calculations for clear error. *See Saleh v. Farmers Ins. Exch.*, 2006 UT 20, ¶ 29, 133 P.3d 428 ("The award of damages is a factual

determination that we review for clear error."). And we perceive no clear error in the court's general adoption—with apparent adjustments—of Robert's expert's damages calculation. In its post-trial ruling, the court described Robert's expert as "an experienced professional in the field of accounting and a licensed financial analyst," and found that her methodologies "provide[d] a reasonably certain calculation of damages" that "account[ed] for both excess distributions and losses incurred due to [the] present value of money." And as noted, the court in making its award apparently made adjustments, based on the evidence presented, to the expert's computations. Under these circumstances, Taylor simply hasn't carried his burden of demonstrating any clear error in the court's general adoption of Robert's expert's damages methodologies, as adjusted.[14] *See id.*

¶99     However, we do see clear error in the court's award of $250,000 in damages to Robert for Taylor's payment of Trust assets to Robert's ex-wife. The court found that this payment was made in violation of the Trust's spendthrift provision and was therefore unlawful. But the court also found that the payment "did extinguish [Robert]'s debt to [his ex-wife]," which debt was a non-zero amount. The court, in a previous order, correctly noted that Robert's damages on this point should be limited to "any interest losses that he . . . may have been entitled to" and money he would have saved if he could prove that his ex-wife would have accepted a lower amount. And of course, his damages calculation would need to account for any excess amounts paid to his ex-wife from other sources, such as his allegation that she

---

14. In this same vein, Taylor makes a cursory and unsupported allegation in his brief that Robert cannot recover for "hypothetical growth in value" of Trust assets because his expert "[r]elied on [s]peculative [a]ssumptions." But he does not suggest what these speculative assumptions were. Thus, this allegation, like some of his other damages assertions, is inadequately briefed.

received an extra $35,000 from the sale of one of his properties; it is notable that Robert, in his proposed post-trial findings, asked the court to award him only $35,000 plus interest on this point. But the court did not engage in a comprehensive analysis here, nor did it make specific findings on these recoverable damages; instead, it simply awarded Robert the entire $250,000 amount.

¶100   The court erred by awarding Robert damages for the full $250,000, at least without making specific findings as to why that amount was appropriate. As the court itself was aware, the $250,000 distribution to Robert's ex-wife had at least some value to Robert—the extinguishing of his debt to his ex-wife—that should have been valued and offset against the $250,000 amount. And the court should have explained why it chose to award Robert the full $250,000 instead of the $35,000 (plus interest) that he asked for in his proposed findings.

¶101  Therefore, while we reject Taylor's general complaint about the court's adoption of Robert's expert's methodologies, we find merit in Taylor's specific complaint about the court's calculation of Robert's damages related to the payment to Robert's ex-wife. We therefore vacate—and remand for reassessment—that specific portion of the damages award. [15]

---

15. Taylor does not appeal the question of whether he—as opposed to Margene or the Estate—should be liable for the repairs to the marital home. Per the Trust, it was Margene—and not the trustee—who was responsible for "perform[ing] such repairs and maintenance as may be required to maintain the property in the condition it was maintained prior to [Dean's] death." Because this issue was not appealed, we do not address its merits.

¶102   In sum, then, we reject all of Taylor's claims on appeal, except for the second of his two damages-related assertions.[16]

## II.  The Estate's Appeal

¶103   We now turn to the Estate's appeal. As noted, the Estate asks us to consider four issues. First, the Estate asks us to reverse the court's determination to hold it vicariously liable for the actions Taylor took as trustee. Second, the Estate challenges the court's conclusion regarding the appropriate rate to be applied in calculating the interest that Robert and Jill owe on the Note. Third, the Estate raises various issues with the form of the judgment. And finally, the Estate asks us to review the court's rejection of its claim for attorney fees incurred in furtherance of its successful claim for interest on the Note. We address each of these arguments in turn.

## A. Vicarious Liability

¶104   The Estate's main challenge on appeal—the one on which it spends the bulk of its energies—concerns the court's ruling that the Estate should be held vicariously liable for the unlawful actions Taylor took as trustee. The Estate criticizes this ruling on two specific grounds, one procedural and one substantive. The procedural challenge has to do with whether the issue was

---

16. We are also aware of Taylor's motion, filed with this court on June 30, 2023, asking us, "pending [our] imminent ruling," to stay enforcement of the judgment. However, now that we have decided the case, the motion to stay has been rendered moot. *See M.N.V. Holdings LC v. 200 South LLC*, 2021 UT App 76, ¶ 17 n.10, 494 P.3d 402 (determining that a motion to stay had been mooted by the issuance of the opinion); *Koyle v. Davis*, 2011 UT App 196, ¶ 7, 261 P.3d 100 (per curiam) (recognizing that our resolution of a case on appeal "renders the motion to stay moot"), *cert. denied*, 263 P.3d 390 (Utah 2011).

properly before the court for decision in the first place. And the substantive challenge has to do with whether the court's decision was correct. We find merit in both of the Estate's challenges to the court's vicarious liability ruling.

1

¶105　The Estate begins its argument by pointing out, correctly, that Robert did not plead or seek vicarious liability in his petition or in any other place in his voluminous pretrial filings in this case. In his petition, Robert sought specific relief against the Estate for damages related to the marital home. Aside from that particular request, the petition sought only one other thing from the Estate: "a return of principal wrongfully distributed from the Trust." In the petition, Robert never asked the court to hold Margene or the Estate vicariously liable for Taylor's conduct.

¶106　Not only did Robert fail to plead a claim for vicarious liability, but as the litigation proceeded, he implicitly disavowed making any such claim. Prior to trial, Robert filed a motion to bifurcate, asking the court to separate the trial of the Estate's claims—most notably, for interest on the Loan—from the trial of Robert's claims relating to Taylor's alleged breaches of fiduciary duty. In this motion, Robert suggested that the claims stated in his petition against the Estate—chiefly, regarding the marital home— had already been "likely resolved" in a recent ruling. In particular, Robert asserted that "the only issue remaining" with regard to his petition "is the amount of damages to be awarded against Taylor," and he argued that the Estate "should not be involved in" the trial of his claims against Taylor. Had Robert been seeking a vicarious liability ruling against the Estate, he would never have taken that position.

¶107　To its credit, the trial court recognized these realities and, in announcing its ruling that the Estate should be held vicariously liable, did not attempt to assert that the issue had ever been raised

prior to trial. Instead, the court held that the issue of the Estate's vicarious liability had been tried by consent during the multi-day bench trial. *See* Utah R. Civ. P. 15(b)(1) ("When an issue not raised in the pleadings is tried by the parties' express or implied consent, it must be treated in all respects as if raised in the pleadings."). Here on appeal, the Estate asserts that the trial court incorrectly concluded that this issue was tried by consent. We agree.

¶108 Under rule 15(b) of the Utah Rules of Civil Procedure, "implied consent to try an [unpleaded] issue may be found where one party raises an issue material to the other party's case or where evidence is introduced without objection, where it appears that the parties understood the evidence is to be aimed at the unpleaded issue." *Hill v. Estate of Allred*, 2009 UT 28, ¶ 48, 216 P.3d 929 (quotation simplified). In such instances, the pleadings are deemed amended after the fact, in order "to conform them to the evidence" presented at trial. *See* Utah R. Civ. P. 15(b)(1). "The test for determining whether pleadings should be deemed amended under Utah R. Civ. P. 15(b) is whether the opposing party had a fair opportunity to defend and whether it could offer additional evidence if the case were retried on a different theory." *Hill*, 2009 UT 28, ¶ 48 (quotation simplified). "When evidence is introduced that is relevant to a pleaded issue and the party against whom the amendment is urged has no reason to believe a new issue is being injected into the case, that party cannot be said to have impliedly consented to trial of that issue." *Id.* (quotation simplified); *see also Archuleta v. Hughes*, 969 P.2d 409, 412 (Utah 1998) ("Implied consent of the parties must be evident from the record." (quotation simplified)).

¶109 Robert asserts that "the Estate showed awareness of its potential liability" several times during the lawsuit. For instance, it lodged an objection to the portion of the prayer for relief in Robert's petition that requested the return of wrongfully distributed principal from the Estate, and it informed the court, at trial and in certain post-trial hearings, that one of the Estate's

goals in the litigation "was to assure that liability for Taylor's wrongful acts did not 'slop over' to the Estate." But awareness of an unpleaded issue does not necessarily constitute consent that the issue be tried, especially here where the Estate demonstrated its awareness of the issue by *objecting* (rather than consenting) to the issue's presence in the case. More is required. There must be some indication that the Estate expressly or impliedly consented to the litigation of the merits of the unpleaded issue at trial. *See Archuleta*, 969 P.2d at 412 ("There must, of course, be either express or implied consent of the parties for the trial of issues not raised in the pleadings."). And here, the record does not support the proposition that the Estate expressly or impliedly consented to try the issue of its vicarious liability for Taylor's conduct.

¶110  Certainly, there is no indication that the Estate ever *expressly* consented to amendment of Robert's pleadings to add the issue of its vicarious liability. Neither Robert nor the trial court directs our attention to any such evidence.

¶111  And in our view, the record cannot support the conclusion that the Estate ever *impliedly* consented to trial of that specific unpleaded issue. As noted, awareness of the issue is not enough. Neither Robert nor the trial court points us to evidence "introduced without objection, where it appears that the parties understood the evidence is to be aimed at the unpleaded issue." *Hill*, 2009 UT 28, ¶ 48 (quotation simplified). In the court's ruling on this point, it recited evidence that Taylor had conflicts of interest, was acting in several different capacities, and used his authority in those capacities to benefit his mother; the court concluded therefrom that "[t]hese circumstances are sufficient grounds to find that the issue of liability as to the Estate was tried by consent." This is incorrect. All of this evidence—regarding Taylor's conflicts of interest, breaches of duty, and actions taken to benefit Margene—is relevant to Robert's overarching claims against Taylor. Its presence in the case would not have signaled to the Estate that the unpleaded issue of its vicarious liability for

all those actions was somehow being litigated.[17] *See id.* ("When evidence is introduced that is relevant to a pleaded issue and the party against whom the amendment is urged has no reason to believe a new issue is being injected into the case, that party cannot be said to have impliedly consented to trial of that issue." (quotation simplified)). We are aware of no evidence presented at trial that clearly and exclusively went to the issue of whether the Estate should be held vicariously liable for Taylor's actions.

¶112   But perhaps the most telling sign that the vicarious liability issue was not tried by implied consent of the parties is that even *Robert* didn't appear to believe, after the trial, that the issue had been tried. In the set of proposed findings and conclusions he submitted about a month after the trial ended, Robert included no findings or conclusions regarding the Estate's vicarious liability, and he did not ask the court to so rule. The closest he came to the issue was asking for a finding that imposed "a constructive trust on the assets of the Estate" and an order that "all remaining [Estate] assets payable or distributable to Taylor be used to pay the outstanding judgments in this case."

---

17. Similarly, the Estate's failure to object to evidence that could conceivably have supported a constructive trust claim does not constitute implied consent to trial of an unpleaded vicarious liability claim. *See Hill v. Estate of Allred*, 2009 UT 28, ¶ 48, 216 P.3d 929. As discussed below, Robert may or may not have properly pleaded a claim that a constructive trust be imposed on Estate assets, at least to the extent that those assets consist of wrongfully distributed Trust principal; we offer no opinion on that question. But even assuming, for purposes of this discussion, that he did properly plead a claim for constructive trust, such a claim is a far cry from a claim for complete vicarious liability for all actions, and the Estate's perceived acquiescence in admission of evidence supporting a constructive trust claim does not necessarily signal consent to trial of a vicarious liability claim.

¶113   Thus, the issue of the Estate's vicarious liability was never pleaded or sought by Robert and was never tried by consent of the parties. The trial court came up with the theory all on its own, many months after the trial had concluded. This was procedurally inappropriate. We therefore reverse the court's ruling that this unpleaded issue was tried by the consent of the parties.

2

¶114   Because the issue of the Estate's vicarious liability was neither pleaded nor tried by the consent of the parties, the trial court's ruling holding the Estate vicariously liable for Taylor's actions is infirm and subject to reversal for that reason alone. But the court's vicarious liability ruling was also wrong on its merits, and we opt to explain why, in order to provide certain guidance that may be useful on remand.

¶115   There appear to be three different theories, floated by the parties (or the court) at various times in the case, as to how Robert and his siblings might access the assets of the Estate to compensate them for the unlawful acts Taylor took as trustee of the Trust.[18] First, there is the court's own vicarious liability theory,

18. At oral argument before this court, Robert's attorney hinted at a fourth theory, and suggested that the court, in ruling that the Estate was vicariously liable for Taylor's actions as trustee, might have been applying a contract-based construct. But the court's written rulings on this topic do not appear to rely on any such theory. In addition, we are aware of no specific contractual obligation that might be utilized for this purpose. The only obligation Margene had under the Trust documents was the duty to keep the home in good condition. She was never the trustee, never had any authority to distribute Trust assets, never signed the Trust, and did not receive Trust assets upon any condition, and therefore never had any contractual obligation regarding

(continued…)

which we refer to as the "conflict of interest" theory. As the court explained it, Taylor wore several somewhat-conflicting hats at various times throughout the case: he was trustee of the Trust, he had power of attorney over Margene's personal finances, he was (after Margene's death) personal representative of the Estate, and he (along with Margene's other children) is one of the beneficiaries of the Estate. In the court's view, Taylor was motivated to benefit himself and the Estate where he could, and he used his authority in these various roles—most notably as trustee of the Trust—to do just that. Essentially, the court ruled that, because many of the unlawful actions Taylor took as trustee of the Trust benefited Margene and the Estate, the Estate should be vicariously liable for Taylor's actions, and should therefore answer to Robert (and his siblings) for Taylor's conduct.

¶116 Second, there is the agency law theory upon which Robert largely relies here on appeal: that Taylor was an "agent" of Margene (and, by extension, the Estate) in carrying out his unlawful acts, and that the Estate—as principal—should be vicariously liable for its agent's activities.

¶117 Finally, there is a constructive trust theory—expressly sought in Robert's proposed post-trial findings—under which the Estate is not necessarily vicariously liable for Taylor's actions as a general matter but, instead, the assets of the Estate may be used to satisfy Robert's judgment against Taylor, at least to the extent that those assets stem from the Estate's receipt of unlawful distributions from the Trust. Specifically, Robert's proposed post-trial findings asked for the imposition of "a constructive trust on the assets of the Estate" and an order that "all remaining [Estate]

---

those assets. *See, e.g., Bloom Master Inc. v. Bloom Master LLC*, 2019 UT App 63, ¶ 13, 442 P.3d 1178 ("To form an enforceable contract, the parties must have a meeting of the minds on the essential terms of the contract." (quotation simplified)). We therefore reject any contract-based argument for vicarious liability.

assets payable or distributable to Taylor be used to pay the outstanding judgments in this case."

¶118   The first two of these theories do not work. Even accepting the court's central proposition—that Taylor had conflicting responsibilities—we cannot see how that fact leads to a legal conclusion that the Estate is generally liable for unlawful actions Taylor took in his capacity as trustee of the Trust. Under the Trust documents, only Taylor (as trustee) had any authority to make distributions. Margene (as "surviving spouse") had no such authority, with the Trust documents stating that "[t]he surviving spouse shall have no power to appoint" Trust property to any other person. Taylor's unlawful distributions were undertaken in his capacity as trustee of the Trust, and Margene had no authority to make any distributions of Trust assets; because she had no such authority, she couldn't have delegated any of it to Taylor, via the power of attorney or otherwise. In other words, Taylor's authority to take actions as trustee didn't come from Margene, it came directly from the Trust documents themselves. We acknowledge that it certainly appears that the Estate may have benefited from Taylor's unlawful actions. But we are aware of no authority—neither Robert nor the trial court cited any—indicating that an entity that benefits from someone else's bad acts is thereby vicariously liable for those bad acts.

¶119 And the second theory—that Taylor was acting as Margene's (or the Estate's) agent when he committed the unlawful acts—fails for similar reasons. As an initial matter, there is no evidence that Taylor was acting as Margene's agent at all when, acting as trustee of the Trust, he made distributions from the Trust to Margene. That is, there is no evidence that Margene instructed him to make any distributions, or that he was acting on Margene's behalf when he did so. The mere fact that Margene benefited from Taylor's actions does not mean that Taylor was acting as Margene's agent; this is especially true where, as here,

the alleged principal (Margene) possessed no authority to make the distributions in question.

¶120   But more substantively, even if we assume that Taylor was acting as Margene's agent, a principal is liable for an agent's actions only under certain circumstances. *See Stein Eriksen Lodge Owners Ass'n Inc. v. MX Techs. Inc.*, 2022 UT App 30, ¶ 25, 508 P.3d 138 ("Under agency law, an agent cannot make its principal responsible for the agent's actions unless the agent is acting pursuant to either actual or apparent authority." (quotation simplified)). "Actual authority may either be express or implied." *Hussein v. UBS Bank USA*, 2019 UT App 100, ¶ 32, 446 P.3d 96, *cert. denied*, 455 P.3d 1062 (Utah 2019). "Express [actual] authority exists whenever the principal directly states that its agent has the authority to perform a particular act on the principal's behalf." *Drew v. Pacific Life Ins. Co.*, 2021 UT 55, ¶ 54, 496 P.3d 201 (quotation simplified). "Implied [actual] authority includes acts which are incidental to, or are necessary, usual, and proper to accomplish or perform, the main authority expressly delegated to the agent." *Id*. (quotation simplified). And apparent authority exists "when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations." *Id.* ¶ 55 (quotation simplified). Robert makes no effort to persuade us that Taylor was acting pursuant to either actual or apparent authority from Margene when he committed the unlawful acts.

¶121 Robert does observe—correctly—that Margene gave Taylor power of attorney over her personal finances. But he does not explain how this narrow grant of authority led to the unlawful acts Taylor committed as trustee, or constituted the type of authority by which the Estate can be held vicariously liable for Taylor's malfeasance. The scope of this grant of authority extended only to Margene's own personal finances; Margene had no authority to disburse Trust funds, and therefore could not have granted, by her power of attorney, any such authority to Taylor,

either expressly or impliedly. And as a practical matter, nothing Taylor did with Margene's personal finances could have, by itself, impacted the Trust; after all, by the time Taylor took actions pursuant to his power of attorney—e.g., moving money from Margene's personal accounts to, say, his own—he would by definition have *already* committed the unlawful acts in question—distributing Trust principal into Margene's accounts in the first place. That is, the specific bad acts at issue here weren't undertaken pursuant to any authority Margene gave Taylor; they were committed pursuant to authority Taylor already possessed, as trustee, under the Trust documents. Under these circumstances, Robert has not borne his burden of persuading us that vicarious liability exists here under principles of agency law.

¶122   Moreover, as noted, the trial court did not rely on this theory; if we were to rely on it here, we would be affirming on a different ground, something we may do only if that ground is "apparent on the record." *See Croft v. Morgan County*, 2021 UT 46, ¶ 43, 496 P.3d 83 (quotation simplified). It is certainly not apparent from this record that Taylor had authority from Margene to act on her behalf in making unlawful distributions of Trust principal.

¶123   Thus, on the record before us, we see no basis in law for the Estate to be held vicariously liable, as a general matter, for acts Taylor committed as trustee of the Trust. We therefore reverse the trial court's ruling to that effect.

¶124   Before concluding our analysis, however, we discuss the third theory by which assets of the Estate might conceivably be used to satisfy a judgment entered against Taylor in connection with his malfeasance as trustee: Robert's apparent request that the court impose a constructive trust on the assets of the Estate, at least to the extent that those assets are derived from unlawfully distributed Trust assets. As noted, this theory is more limited than a vicarious liability theory—imposition of a constructive trust would not connote that Margene or the Estate did anything wrong

and would not result in the Estate being generally liable for Taylor's unlawful actions. But imposition of a constructive trust would enable Robert (and his siblings) to reach at least certain assets of the Estate to compensate them for Taylor's malfeasance. *See Lodges at Bear Hollow Condo. Homeowners Ass'n, Inc. v. Bear Hollow Restoration, LLC*, 2015 UT App 6, ¶ 31, 344 P.3d 145 ("Constructive trusts are usually imposed where injustice would result if a party were able to keep money or property that rightfully belonged to another." (quotation simplified)).

¶125 It is unclear to us whether Robert properly pleaded and pursued this theory or, if not, whether it was tried by consent of the parties. Robert certainly asked for this relief in his proposed post-trial findings, at least regarding Taylor's share of the Estate's assets. But the trial court specifically eschewed this theory during post-trial proceedings, offering its view that it "need not retreat to any equitable theory"—for instance, constructive trust—to support its determination regarding vicarious liability. However, the court expressly stopped short of rejecting a constructive trust theory, stating in a later ruling that it had not ruled on the theory, but instead had merely "ruled on an alternative ground," and further clarifying that the fact that it "didn't rule on that theory . . . doesn't mean that [the court] didn't accept it." Indeed, the court went so far as to say that, if a constructive trust theory was "what the parties believe is a more proper finding," the court may be willing to impose such a trust.

¶126 On remand, the court should consider whether Robert properly pleaded a claim for constructive trust and, if not, whether that claim was tried by consent of the parties. If the court determines that the claim is properly before the court, it should then consider the merits of the claim, and evaluate whether and to what extent a constructive trust should be imposed on the assets of the Estate in favor of Robert and his siblings. The merits of these questions have not been briefed in connection with this appeal, and we express no opinion on them, nor do we express

any opinion regarding whether, on remand, these questions can or should be decided on the existing evidentiary record or whether additional proceedings would be appropriate.

## B. Interest Rate

¶127   Second, the Estate asks us to examine the trial court's ruling regarding the rate to be applied in calculating the amount of interest that Robert and Jill owe on the Note associated with the Loan. Despite the fact that the only expert—the Estate's expert—to offer an interest calculation at trial calculated that interest to be $922,219.77, the court concluded that the total amount of unpaid interest owing on the Note was $565,314.97.

¶128   Under the terms of the Note, Robert and Jill agreed to pay "variable interest . . . at the margin loan rate assessed by S[a]lomon Smith Barney on Brokerage Account No. 298-02528-13 303 . . . as may fluctuate from time to time until paid in full." But the calculation is not as straightforward as it may sound, because Robert and Jill failed to repay the Note for eleven years, and there were "some months" during that time span "where an interest rate was not published on the account" referenced in the Note.

¶129   For the months in which an interest rate on the specific account was published, the Estate's expert used the published rate, which varied by month and ranged from 4.125% to 11%. For most of the "gap periods"—those months for which no interest rate was published on the account—the expert looked at the rate published for the month *before* the gap and the rate published for the month *after* the gap, averaged the two rates, and applied that average rate for each month during the gap period. Some of these gap periods were short, involving a gap of just a month or two, but other gap periods were quite long, involving periods up to three years without a published interest rate. But for the last gap period—a long one stretching from September 2011 through February 2015—the expert did not use an "average rate"

methodology, because he could find no rate for the end month. Instead, he "made some calls and talked to a Smith Barney representative" who gave him "a range of rates"—from 4.75% to 5.5%—used "during that period of time" on various brokerage accounts. The expert then attempted to "corroborate that" range by comparing those rates to "rates published in the Wall Street Journal" and by discussing the issue "with [his] colleagues," and eventually determined that a "reasonable rate" to use for the last gap period was 4.75%, a rate the expert considered to be "a very conservative rate . . . on the low end of the range." The expert noted that this choice was only "an increase of 1.5% over the prime rate," which he considered to be another sign that his chosen rate was "conservative and reasonable." Applying this methodology, the expert calculated the total amount of interest owing, over the entire eleven-year period, as $922,219.77.

¶130 The trial court found the expert's methodology to be "reasonable," at least for "short gap periods," but nevertheless did not accept the Estate's expert's methodology. It determined that the "Note's repayment of interest term was ambiguous" with regard to the gap periods because the Note did not specify "what should occur if" no monthly interest rate was published for the account in question. It also found that "the intent of the parties" with regard to this ambiguity was "ascertainable sufficient to enforce it." But even though it professed to be considering "extrinsic evidence to clarify the intent of the parties," the court did not actually utilize any such evidence. Instead, it observed that the Note was a "negotiable instrument," and it turned to a statute, located in Utah's Uniform Commercial Code (UCC), for guidance. *See* Utah Code § 70A-3-112. That statute states, in relevant part, that if a negotiable "instrument provides for interest, but the amount of interest payable cannot be ascertained from the description, interest is payable at the judgment rate in effect at the place of payment of the instrument and at the time interest first accrues." *Id.* § 70A-3-112(2). The court concluded that

this statute "provides an adequate remedy at law to execute the intent of the parties as represented in the Note." And it decided to apply this statutory default rate—which turned out to be 3.28%—to all gap periods, regardless of their length, noting that the statutory rate "provides a reliable method at law that relieves the Court from adopting" the expert's methodologies for the gap periods. Notably, the court did not ever find that the Estate's expert's methodology was unreasonable; as noted, it found the methodology reasonable as to short gap periods and, even with regard to the longer gap periods, the court stated that it "appreciate[d]" the expert's "efforts to determine reasonableness of his proposed rates by comparing them with the contemporaneous prime rate." Later, using the published rate for the months in which one existed and the UCC rate for all other months, the court calculated the unpaid interest as $565,314.97.

¶131   The Estate ascribes error to the court's approach, asserting that, after making its ambiguity determination, the court should not have jumped directly to the UCC rate but, instead, should have "determine[d] the parties' intent from extrinsic evidence," including the expert's testimony. The Estate points out that the Note is far from silent on the interest-rate question, and indicates the parties' intent to apply a rate equivalent to the brokerage rate for a particular account. And they assert that the UCC rate "applies only where the instrument is silent on how to calculate interest," and not where the parties' instructions in that regard are simply ambiguous. We find merit in the Estate's argument.

¶132   As an initial matter, we note that the Estate's argument is in line with general principles of contractual interpretation, including the bedrock proposition that, when "a contract term is ambiguous, [trial] courts should consider extrinsic evidence to resolve the ambiguity." *See Brady v. Park*, 2019 UT 16, ¶ 29, 445 P.3d 395. Neither side takes issue with the court's determination that, at least for the gap periods, the Note was ambiguous with

regard to interest rate.[19] But the Estate persuasively argues that, even for gap periods, the Note does give some indication of the parties' intent: they wanted to apply a rate equivalent to the Salomon Smith Barney brokerage rate. And the Estate points out that its expert came up with a methodology, in keeping with the parties' expressed desire to use brokerage rates rather than presumably lower statutory rates, for estimating the brokerage rates for the gap periods, and points out that the trial court even found that methodology to be "reasonable," at least as applied to the shorter gap periods.

¶133   Moreover, courts that have construed the UCC interest rate statute have concluded that it should not be applied in situations where "an ascertainable interest rate is provided but the sum certain requirement fails for lack of evidence concerning a reasonable rate of interest." *See Commercial Services of Perry, Inc. v.*

---

19. And neither Robert nor Jill makes any argument that the UCC rate should apply whenever contractual ambiguity exists with regard to the interest rate. In general, "a court's legal determination that ambiguity exists within a text leads to the conclusion that" a factfinder will need to consider extrinsic evidence. *See Jessup v. Five Star Franchising LLC*, 2022 UT App 86, ¶ 42, 515 P.3d 466. This general principle appears to apply here. At least, neither Robert nor Jill makes any assertion that, given the language of the UCC, this constitutes one of those "other specific areas of the law . . . where clarity between parties is itself at issue" and in which "the presence of ambiguity . . . suggests that a party may be entitled to a judgment as a matter of law." *Id.* (describing some of those exceptional situations). That is, Robert and Jill do not assert that the UCC rate should apply whenever ambiguity in the words used in the instrument prevents a court from easily ascertaining the agreed-upon interest rate. *See* Utah Code § 70A-3-112(2). Because Robert and Jill do not make this argument, we offer no opinion as to its merits.

*Wooldridge*, 968 S.W.2d 560, 565 (Tex. App. 1998). In particular, at least where competent extrinsic evidence exists that can be utilized to estimate a reasonable rate commensurate with the parties' intentions, courts have declined to apply statutory default rates where the parties agreed, in their instrument, to an interest rate tied to a specific bank's prime rate and where that bank goes out of business. *See, e.g.*, *Ginsberg 1985 Real Estate P'ship v. Cadle Co.*, 39 F.3d 528, 533 (5th Cir. 1994) (applying "an analogous prime rate," rather than a default statutory rate, to calculate interest after a bank failure, where the contract called for interest at that bank's prime rate plus 1%); *FDIC v. Blanton*, 918 F.2d 524, 532–33 (5th Cir. 1990) (determining that a default statutory rate was "inapplicable" where the parties had agreed upon an interest rate equivalent to a specific bank's rate plus 1% and where the bank had failed, holding that "[t]he trial judge could have applied an analogous prime rate as consistent with the intent of the parties"). We consider the failed-bank situation helpfully analogous to this one, and find the analysis applied by the courts in those cases persuasive and useful in this situation.

¶134   In those cases, courts examine extrinsic evidence to make a finding regarding a rate that would be reasonable and most in line with the parties' intent. *See Central Bank v. Colonial Romanelli Assocs.*, 662 A.2d 157, 158 (Conn. App. Ct. 1995) ("When a variable interest rate is based on the rate of a failed institution, the trial court must determine whether the substitute rate is reasonable by examining the documents and testimony offered by the plaintiff."); *FDIC v. Cage*, 810 F. Supp. 745, 747 (S.D. Miss. 1993) ("Because the rate of interest is a term which is essential to a determination of the rights and duties of the parties and because the parties to this action understandably failed to specify the interest rate to be applied upon the failure of [an institution], it is left to the Court to determine a reasonable rate of interest."). Importantly, "in determining reasonableness" in situations involving a failed bank, "the court need not determine the exact

methodology used by the failed bank in calculating its internal interest rate; such a determination would be impossible in many circumstances. Rather, the court must determine whether the substitute rate was reasonable based on all the circumstances of the particular case." *Ninth RMA Partners, L.P. v. Krass*, 746 A.2d 826, 831 (Conn. App. Ct. 2000) (quotation simplified).

¶135    In this case, the trial court did not undertake this type of analysis. Instead, without fully evaluating the reasonableness of the Estate's proffered extrinsic evidence (chiefly, the expert's methodology), the court jumped straight to the UCC default rate, stating that "the UCC provides an adequate remedy at law to execute the intent of the parties" and "relieves the Court from adopting" the expert's methodology. And the court did so without making any finding that the expert's unrebutted testimony was unreasonable or unreliable; to the contrary, the court expressly found the expert's methodology "reasonable," at least for use over shorter gap periods. And it made little effort to explain why it found the expert's methodology reasonable for shorter gap periods but not necessarily for longer ones; it stated only that the expert's gap period rates were "hypothetical and speculative," a criticism that would seem to apply to all gap periods regardless of their length, and that will apply, at least to some extent, any time an effort is made to estimate an interest rate for a bank that, for instance, has gone out of business. Instead of explaining why it rejected the expert's conclusions, the court simply stated that it "does not adopt" the expert's "method as a proper means to ascertain interest," and instead elected to apply the UCC rate. Contrary to the court's statement, the statute did not "relieve" the court of its obligation to apply an interest rate commensurate with the intentions of the parties, nor of its obligation to grapple with, and make specific findings regarding, the credibility and reasonableness of the extrinsic evidence offered by the Estate and its expert.

¶136   Certainly, if the court had made specific and supported findings that the expert's methodology was unconvincing and unreasonable across the board, and that therefore the Estate's extrinsic evidence was not credible, it may have been possible for the court to default to the UCC rate. In that scenario—where the other side (Robert and Jill) did not offer any extrinsic evidence of their own and where the Estate's evidence was deemed not credible—there would exist no competent extrinsic evidence to assist the court in ascertaining a rate reasonably equivalent to the one the parties intended, and therefore defaulting to a statutory rate may be appropriate. But absent such findings, the court should make a determination, based on the extrinsic evidence offered, as to the interest rate most reasonably equivalent to the intent of the parties as expressed in the Note.

¶137   We therefore vacate the court's interest-rate determination, and remand the case to the trial court for reassessment of a reasonable rate of interest that best approximates the intentions of the parties. In so doing, the court should specifically assess the reasonableness of the Estate's expert's methodology. To the extent the court finds the expert's methodology reasonable—as it already has with respect to short gap periods—it should apply that methodology, given the absence of other extrinsic evidence. The court should resort to the UCC statutory rate only to the extent it finds the expert's methodology unreasonable, and not merely because the expert's effort to estimate a rate that, by definition, does not exist is somewhat hypothetical. We imagine that this reassessment might be done by resort to the existing evidentiary record, but it will certainly be within the court's discretion to hold additional proceedings if necessary.

### C. The Form of the Judgment

¶138   Next, the Estate raises several issues with the form of the judgment the court entered in this case. First, the Estate challenges the court's award of damages against it related to repairs to the

marital home. Second, the Estate wonders who the proper judgment creditors are. Finally, and relatedly, the Estate raises setoff-related issues arising from the fact that it obtained an award against both Robert and Jill; it asks us to instruct the trial court to enter a separate judgment in favor of Robert and Jill, or to otherwise resolve the issues related to the court's decision to set off the money owed to the Estate against the money the Estate owes to Robert. We find merit, at least to some extent, in all of the Estate's complaints related to the form of the judgment, and we therefore vacate the court's judgment and remand these issues to the trial court for clarification.

1

¶139 First, the Estate complains about the court's award of damages to Robert, and against the Estate, for damages to the marital home. Its main complaint in this regard is that Robert did not point to any evidence that he—as opposed to Jeana—had actually been damaged.[20] This challenge is well-taken.

¶140 The trial court found, in determinations not challenged on appeal, that the marital home "was in excellent repair and condition" at the time of Dean's death, but that Margene did not continue to properly maintain the property afterward. After Margene's death, Jeana purchased the home, and made significant repairs that were necessitated by Margene's failure to properly maintain the home. The court found that Jeana purchased the home for full value—without the benefit of any discount for the condition of the home—and then made the

---

20. The Estate also complains about the *amount* of this damages award, asserting that it should be for $29,439 instead of $33,500. There was evidence supporting both damages figures, and the trial court was within its discretion to select the slightly higher one. We therefore reject the Estate's challenge to the amount of this portion of the damages award.

repairs to the home out of her own pocket. In view of these apparently undisputed facts, the court determined, in its main post-trial ruling, that the damages related to the home repairs were "owed to Jeana."

¶141 Despite determining that any damages in this regard were owed to Jeana, the court's judgment—entered some months after its main post-trial ruling—reflected that these damages were to be paid to Robert. Robert offers no good explanation for this, asserting simply that he and Jeana, "as beneficiaries" of the Trust, "have standing and are entitled to damages" related to the repairs to the marital home. But standing is one thing; evidence of damages is another. We agree with the Estate that Robert—personally, as distinct from Jeana—offered no evidence that he sustained damages related to the repairs to the home, and that the judgment in this case should be modified to remove any obligation by the Estate to pay *Robert* for those damages.

2

¶142 The Robert-or-Jeana issue related to repairs to the marital home is just one confusing result of the court's decision to list Robert—and *only* Robert—as judgment creditor. By this point in the opinion, it should be apparent that—for the most part, and with certain exceptions such as perhaps the payment to Robert's ex-wife—the damages Taylor caused were visited upon the Trust, and all its beneficiaries, and not just upon Robert. Yet the trial court—over objection—determined to list Robert as the sole judgment creditor, even though it awarded the full amount of the Trust's damages. This was error and requires us to vacate the judgment and remand the issue for clarification.

¶143 The court can remedy this overarching error in one of two ways. First, it could elect to enter judgment in favor of not just Robert but, instead, either (a) the Trust (or, alternatively, the trustees of the Trust in their official capacity) or (b) all three

beneficiaries, each to the extent of their damage. Second, it could elect to have Robert remain as the sole judgment creditor but, in this event, it would need to reduce the damages award to reflect the fact that Robert is entitled to receive only one-third of any damages sustained by the Trust.

¶144  We offer no opinion as to which option the court should choose on remand. Each has potential procedural pitfalls; from our review of the record, the party status of Jill and Jeana is somewhat unclear. But one thing the court may not do is enter judgment in favor of Robert, personally, in the full amount of *the Trust's* damages.

3

¶145 Next, the Estate raises the related issue of how to memorialize the judgment in its favor, and against Robert and Jill, for unpaid interest on the Note. The court's judgment resolved this issue by way of setoff, awarding damages to Robert and against the Estate associated with the Estate's determined vicarious liability for Taylor's actions as trustee, and then setting off against that amount the interest Robert owed to the Estate. The Estate complains about the way the court handled this, pointing out that—even if the court correctly applied setoff principles with regard to Robert—the court awarded no money in Jill's favor and therefore could not have applied setoff principles with regard to Jill's obligation to pay interest to the Estate. In other words, the Estate complains that the court held that it was entitled to recover several hundred thousand dollars from Jill but gave the Estate no way to actually go about collecting on this award. Again, the Estate's complaint is well-taken; the court erred in the way it applied setoff principles under these circumstances.

¶146  This issue may, however, be rendered moot by this court's determination that the Estate is not vicariously liable for Taylor's actions as trustee, *see supra* Part II.A, and by its determination that

the Estate is not liable to Robert (as opposed to, potentially, Jeana) for the repairs to the marital home, *see supra* Part II.C.1. Unless the court, after reconsidering Robert's potential claim for constructive trust, actually imposes such a trust, no judgment will be entered against the Estate in favor of Robert or Jill. In any event, and even if the court ends up entering a judgment for constructive trust against the Estate and in favor of the Trust's beneficiaries, the court in clarifying judgment-related issues should make sure that the judgments properly account for the Estate's award against both Robert and Jill for unpaid interest.

## D. Attorney Fees

¶147 Finally, the Estate appeals the denial of its request for attorney fees incurred in support of its claim for unpaid interest on the Note. Its claim is rooted in the language of the Settlement Agreement and related Note, which both have attorney fee provisions; the one contained in the Note requires Robert and Jill "to pay all reasonable costs and expenses of collection of any amount due under this Note including reasonable attorney's fees." Neither Robert nor Jill contests the Estate's claim that, at least conceptually, the Estate would be entitled to recover attorney fees incurred in obtaining its judgment for unpaid interest on the Note. After all, the Estate prevailed on that specific claim. Indeed, in its attorney fees ruling, the trial court acknowledged that Robert and Jill "as guarantors of the [N]ote would owe fees [to the Estate] pursuant to a strictly construed reading of" the Note's attorney fees provision.

¶148 But the trial court nevertheless denied the Estate's claim for attorney fees, for several reasons. First, and chiefly, the court denied the Estate's claim because, in the court's view, the Estate had failed to sufficiently allocate its incurred fees between its successful and unsuccessful claims. Under our law, a party requesting attorney fees has an obligation to allocate its fees between claims on which it is entitled to fees and claims "for

which there is no entitlement to attorney fees," and should limit its fee request to only those specific fees incurred in aid of claims on which it is entitled to fees. *See Zion Village Resort LLC v. Pro Curb USA LLC*, 2020 UT App 167, ¶ 62, 480 P.3d 1055 (quotation simplified). A requesting party who fails to do so "makes it difficult, if not impossible, for the trial court to award . . . fees because there is insufficient evidence to support the award." *See Jensen v. Sawyers*, 2005 UT 81, ¶ 132, 130 P.3d 325. Indeed, if a requesting party makes no effort to allocate its fees, a court "may, in its discretion," elect to "not award wholesale all attorney fees" or may "deny fees altogether for failure to allocate." *Burdick v. Horner Townsend & Kent, Inc.*, 2015 UT 8, ¶ 59, 345 P.3d 531 (quotation simplified). But a court's discretion in this regard is not unlimited, and "is not an invitation to forego a reasoned analysis." *Id.* ¶ 60. Indeed, in *Burdick*, our supreme court determined that a trial court had abused its discretion by denying a request for attorney fees, in its entirety, for failure to allocate, noting that the movant's "affidavit clearly identifie[d] 282 hours attributable only to" the successful claim. *Id.* The court remanded the matter to the trial court to "conduct a reasonableness analysis and attempt to discern what fees may be divided between the" successful claims and the unsuccessful claims. *Id.* ¶ 61.

¶149   In this case, some of our rulings described herein (*see supra* Parts II.A, II.B, and II.C) have changed the landscape with regard to allocation enough to require a remand, so that the Estate can resubmit its fee request in light of our rulings and so that the trial court can, in light of those rulings, reassess the quality of the Estate's effort to allocate its requested fees. Most notably here, the fees the Estate incurred in advocating for its expert's methodology for calculating the rate of interest may—depending on how proceedings on remand turn out—need to be included in the award. But in any event, we have some concerns with the trial court's original analysis, and we express those concerns here in an effort to provide guidance on remand.

¶150 First, we are not convinced that the Estate's allocation efforts—even the first time around—were so poor as to necessitate a *complete* denial of its attorney fees claim. In its ruling, the trial court acknowledged that "the [E]state made some effort to" allocate fees, "as it removed or modified fees claimed for work advancing arguments or upon which it did not prevail." The record bears this out. The Estate eliminated (wholly or partially) from its fee request some forty-eight line items totaling nearly $30,000 of fees. To be sure, the Estate requested over $174,000 in fees, even after the allocation, and one could conceivably argue, depending on the circumstances, that reducing only $30,000 from fees totaling more than $200,000 does not constitute sufficiently deep cuts. But the Estate's allocation effort does, to our eye, appear to be detailed, targeted, and undertaken in good faith. The Estate's main claim—and the primary reason for its presence in the litigation—was the one for unpaid interest on the Note; it does not seem to us implausible that the majority of its fees would have been incurred in aid of litigating that claim. In situations like this, where a party has taken a good-faith and detailed run at allocation, the better approach—if a trial court remains of the view that the cuts are not quite deep enough—is to make a reduced award rather than to deny the request in its entirety. Wholesale denial of a fee request on allocation grounds should be reserved for situations where a party either makes no effort to allocate at all, *see Burdick*, 2015 UT 8, ¶ 59 (stating that a court may "deny fees altogether for *failure* to allocate" (emphasis added)), or where a party makes only token or wholly inadequate attempts to allocate.

¶151 Next, the court mentioned several other factors that influenced its decision to deny the Estate's fee request that were, in our view, not a proper basis for denial. For instance, the court noted that, for many years, "no significant steps were taken to timely collect on the [N]ote," and appeared to hold this against the Estate in assessing its claim for fees. But it was the Trust's responsibility for pursuing repayment of the Note, at least until

Margene's death (at which point unpaid interest became payable to the Estate); any delays in pursuing collection from 2004 through 2015 cannot be laid at the feet of the Estate and are, in any event, beside the point. After Margene's death, and after the principal amount of the Note was effectively paid off in connection with the first distribution to the Trust beneficiaries, the Estate soon pursued this action to recover the unpaid interest. There is no basis to hold delays in enforcement against the Estate in connection with assessing its claim for fees.

¶152 Next, the court speculated that the provision of the Settlement Agreement directing that unpaid interest on the Note was to be paid to the Estate, rather than to the Trust and its three beneficiaries, "was contrary to the intent and past practice of" Dean, and the court stated that it was "troubled" by that provision. The court noted that this sentiment was "not central to its decision," but it should go without saying that the court should not have taken this into account at all in connection with assessing the Estate's fee request.[21]

¶153 In short, we vacate the court's order denying, in its entirety, the Estate's claim for attorney fees; we do so largely because, in our view, the rulings set forth elsewhere in this opinion have changed the landscape enough to necessitate a reassessment of

---

21. The Estate also asserts that the trial court more heavily scrutinized its fee request than it did Robert's, asserting that—like the Estate—Robert also failed to prevail on all of his claims and motions, and therefore should also have been required to allocate his requested fees between successful and unsuccessful endeavors. The propriety of the court's fee award to Robert is not at issue in this appeal, and we therefore decline to comment on the court's handling of Robert's fee request, other than to state that courts should, of course, evaluate fee requests from the various parties in the case by the same standards.

that claim. And we remand the matter to the trial court for reassessment of that claim consistent with this opinion.

CONCLUSION

¶154   We reject all but one of Taylor's arguments on appeal. The trial court did not abuse its discretion in denying Taylor's motion to amend. Taylor has not carried his burden, on appeal, of showing error in the court's partial summary judgment ruling, or of demonstrating abuse of discretion in its decision to exclude Taylor's experts. We also affirm much of the court's damages award against Taylor, but vacate the court's award of damages against Taylor related to the payment to Robert's ex-wife.

¶155   We find merit in most of the Estate's arguments on appeal. The court erred in holding the Estate vicariously liable for the actions Taylor took as trustee. The court also erred in its approach to calculating the interest owed to the Estate on the Note, as well as in various aspects of its judgment. In addition, we remand the question of the Estate's entitlement to attorney fees.

¶156   Accordingly, we vacate the judgment entered by the trial court, and remand this case for further proceedings consistent with this opinion; those proceedings should, among other things, involve evaluation of Robert's potential claim for constructive trust against the Estate, reassessment of the amount of interest the Estate is owed, clarification of the judgment, and reassessment of the Estate's claim for attorney fees incurred in connection with its successful claim for unpaid interest.

_____